IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FEDERATED MUTUAL INSURANCE      )
COMPANY,                        )
                                )
            Plaintiff,          )
                                )
      v.                        )      Civil Action No. 1:08cv00176
                                )
WILLIAMS TRULL COMPANY, INC.    )
                                )
            Defendant.          )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

     This is a declaratory judgment action by Plaintiff Federated Mutual Insurance Company ("Federated"). Federated seeks to determine whether coverage exists under an insurance policy issued to Defendant Williams Trull Company, Inc. ("Williams Trull"), which was damaged by fire at approximately 11:30 p.m. on October 3, 2007 (the "Fire"). The case was tried to the court for five days, and the matter is ripe for decision. Pursuant to Federal Rule of Civil Procedure 52(a) and for the reasons stated herein, the court finds that Federated has demonstrated exceptions to coverage and thus has no obligation to pay under the insurance policy, and that Williams Trull is not entitled to recover on its counterclaims for breach of the insurance policy for failure to pay and alleged unlawful practices by Federated.

## I. FINDINGS OF FACT

### A. Parties

1. Federated is a Minnesota corporation, with its principal place of business in Owatonna, Minnesota. (Doc. 1 (Complaint ("Compl.") ¶ 2).)

2. The Defendant, Williams Trull, is a North Carolina corporation formed in 1947 and located at 1830 South Scales Street in Reidsville, Rockingham County, North Carolina (the "Premises"). (Tr. 4/15/10 at 177.) The company engaged in retail sale of agricultural and lawn and garden equipment, including large and small mowers, and provided parts and servicing. (Doc. 1 (Compl. ¶ 3); Doc. 8 (Answer ¶ 3); Tr. 4/15/10 at 177-78.)

3. William L. Puckett ("Puckett") is the sole officer and shareholder of Williams Trull. (Doc. 1 (Compl. ¶¶ 8, 10); Doc. 8 (Answer ¶¶ 8, 10); Tr. 4/15/10 at 176.) Puckett is also the sole officer and shareholder of Puckett Land Corporation, a North Carolina corporation. (Doc. 1 (Compl. ¶¶ 9, 11); Doc. 8 (Answer ¶¶ 9, 11); Tr. 4/15/10 at 181.)

4. Puckett bought Williams Trull on February 14, 2003, after learning from his father, who had been in the farm implement business for 20 years and worked at Williams Trull, that it was available for sale. (Tr. 4/15/10 at 174.) Puckett purchased Williams Trull through his wholly-owned Puckett Land

Corporation for $600,000 and mortgaged the Premises. (Tr. 4/15/10 at 176-82.)

5. Puckett graduated High Point University in 1986 with a degree in physical education and recreation. (Tr. 4/15/10 at 172.) Growing up he had worked on his family farm and from the mid-1980s until 2003 was employed as a truck driver for United Parcel Service. (Tr. 4/15/10 at 172-73, 178.) He had no personal experience with the farm supply business or in running a business. (Tr. 4/15/10 at 187; Puckett Examination Under Oath ("EUO") at 49; see Tr. 4/13/10 at 182.)

### B. The Federated Insurance Contract

6. Williams Trull purchased a commercial package insurance contract from Federated, Policy Number 9318083 (the "Insurance Contract"), which was in effect and covered the Premises at the time of the Fire. (Doc. 1 (Compl. ¶ 12); Doc. 8 (Answer ¶¶ 12-13).) "Williams Trull Co" is the named insured and beneficiary of any proceeds of the Insurance Contract with respect to Commercial Property Coverage. (See Ex. 1, Doc. 109-1 (Common Policy Declarations).) All premium payments were current at the time of the Fire.

7. For purposes of this litigation, the relevant terms appear in the portion of the Insurance Contract designated "Commercial Property." (Ex. 1, Doc. 109-1 (Common Policy Declarations and Common Forms); Ex. 1, Doc. 109-4 (Commercial

3

Property Coverage).)[1]  The Insurance Contract covered fire damage to the Premises as well as loss of business income and extra expense incurred due to a fire loss.  The Insurance Contract limited damages related to lost business income and extra expense to a "period of restoration," defined as the period beginning immediately after a fire for extra expense coverage and 72 hours after a fire for business income coverage (i.e, lost business income).  (Ex. 1, Doc. 109-4, Form No. CP-F-113, § H.2.a.)  The period of restoration ended at the earlier of the "date when the property . . . should be repaired, rebuilt or replaced with reasonable speed and similar quality" or "the date when the business is resumed at a new permanent location."  (Ex. 1, Doc. 109-4, Form No. CP-F-113, § H.2.b.)  But for the claims in this lawsuit, the Fire would be a compensable loss covered by the Insurance Contract.

8.  North Carolina law, which the parties agree applies, requires an insurer to provide a blank proof of loss form to the insured within fifteen days of receiving notice of the alleged covered event.  Failure to do so results in the insured being "deemed to have complied with the requirements of [the] policy as to proof of loss, upon submitting within the time fixed in the policy for filing proofs of loss, written proof covering the

---

[1]  All referenced exhibits are Joint Exhibits designated to by the parties unless otherwise stated.

occurrence, character, and extent of the loss for which claim is made." N.C. Gen. Stat. § 58-3-40.

9.    The Insurance Contract also provides:  "We [Federated] will give notice of our intentions within 30 days after we receive the sworn proof of loss." (Ex. 1, Doc. 109-4, Form No. CP 00 10 04 02, § E.4.c.)

10.   The Insurance Contract further provides: "This [Commercial Property] Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning: 1. This Coverage Part; 2. The Covered Property; 3. Your interest in the Covered Property; or 4. A claim under this Coverage Part." (Ex. 1, Doc. 109-4, Form No. CP 00 90 07 88, § A; see Ex. 1, Doc. 109-5 (Commercial Inland Marine Conditions), Form No. CM 00 01 09 04, General Conditions, § A.)

**C.    The Fire**

11.    The parties agree that Lelon David Williamson ("Williamson") and his nephew, Kenneth Eugene Sports, Jr. ("Sports"), both in their mid-twenties, intentionally set the Fire late in the night on Wednesday, October 3, 2007, and the court so finds.  Both men were arrested by the Reidsville Police Department as they attempted to flee the scene.  The Fire inflicted heavy damage, destroying equipment, parts, and other

inventory, as well as damaging the business' computer system and paper files, rendering the building useless for conducting an ongoing business.

12. On October 4, 2007, Williams Trull provided notice of the Fire to Federated and confirmed that Williams Trull would be filing an insurance claim (the "Claim"). That same day, Federated adjuster Merle Costello ("Costello") visited the Premises and spoke to Puckett. (Ex. 202 (First Notice of Loss); Tr. 4/13/10 at 213-14; Tr. 4/15/10 at 206-07.)

13. Puckett testified that he planned to continue business operations, and within two days of the Fire had called his employees to work. (Tr. 4/15/10 at 208-10.) Williams Trull took several measures to attempt to continue operations, including setting up and using a temporary trailer, arranging for temporary telephones, and obtaining a generator for power from a hardware store. (Tr. 4/14/10 at 94-95; Tr. 4/15/10 at 194-95.) Puckett also had a platform of sorts built upon which work could be performed. (Tr. 4/15/10 at 207-08.) Williams Trull was able to run power to the computer system in the old building to determine inventory for parts sales. (Tr. 4/15/10 at 210.) However, because of declining business and unavailability of equipment to sell, Williams Trull's operations were limited mostly to parts and repairs. (See Tr. 4/15/10 at 213-14.) Operations were discontinued toward the end of 2007,

and Puckett eventually took another job with a marketing company. (Tr. 4/15/10 at 194-95.)

14. At the time of the Fire, Williams Trull employed a handful of workers in addition to Puckett: Puckett's father, Lewis C. Puckett ("Lewis Puckett"), a salesman; Tommy Hinshaw ("Hinshaw"), a mechanic; Bobby Saferight ("Saferight"), also a mechanic and Hinshaw's nephew; Brandie N. Wilkerson ("Wilkerson"), a parts manager; Amanda Farlow ("Farlow"), office assistant; and William "Peanut" McNabb ("McNabb"), a mechanic and general helper. (Tr. 4/15/10 at 196-97.) Approximately two months earlier, Puckett dismissed two employees, Deborah Hinshaw, Saferight's aunt, and Bob Saferight, Saferight's grandfather who was also known as "Bobby Saferight," because the company could no longer afford to keep them on.

**D. Issues Pending Before the Court**

15. Federated asserts two defenses to coverage: that Williams Trull, by and through Puckett, (1) intentionally procured the setting of the Fire, and (2) misrepresented or omitted material facts during Federated's investigation of the Fire. Federated seeks a declaration that the Insurance Contract is void and that Federated is not liable for any Claim. Following the Fire and at Puckett's request (on behalf of Williams Trull), Federated, under a complete reservation of rights, made periodic advance payments totaling $130,000 in cash

7

to Williams Trull plus an additional payment of $21,748.11 to Servpro, a restoration cleaning company, for a total of $151,748.11. (Tr. 4/13/10 at 221-26, 254; see Exs. 11-A through 11-E, 12.) Federated also seeks the return of these advances. (Doc. 1 at 7-8 (Count I); id. at 8-9 (Count II).)

16. Williams Trull denies that it was involved in procuring the Fire and asserts two counterclaims against Federated. First, it alleges that Federated breached the Insurance Contract by (1) failing to provide it a blank proof of loss form within fifteen days after receiving notice of the Fire, resulting in a waiver of any affirmative defenses regarding alleged deficiencies in the proofs of loss, pursuant to N.C. Gen. Stat. § 58-3-40; and (2) failing to give notice of its intentions within thirty days of any of Williams Trull's proofs of loss, resulting in a loss of any rights Federated may have had to deny the Claim or to assert affirmative defenses. Williams Trull seeks compensatory and exemplary damages. (Doc. 2 at 10-14.) Second, Williams Trull alleges that Federated, through its delay and non-payment, engaged in unfair or deceptive acts or practices in its investigation and adjustment of Williams Trull's Claim, in violation of North Carolina's Unfair or Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1 et seq. ("UDTPA"), as well as N.C. Gen. Stat. § 58-63-15, which defines unfair or deceptive acts or practices under North

Carolina's insurance law. As to these claims, Williams Trull seeks treble damages under N.C. Gen. Stat. § 75-16 and attorneys' fees under N.C. Gen. Stat. § 75-16.1. (Doc. 8 at 14-17.)

17. The parties have stipulated that if a breach of the Insurance Contract is found, damages (actual cash value) are $469,067.44 for the period covering October 3, 2007, through the end of April 2008. This figure includes $30,447 in lost business income during that period. The stipulation does not cover claims for damages thereafter or for damages pursuant to Williams Trull's Second Counterclaim under the UDTPA and other law. (Docs. 111 & 111-1.)

## E. Federated's First Defense: Intentional Burning of the Premises

### 1. Official Investigation Related to the Fire

18. John Edward Harris, II ("Chief Harris"), the Reidsville Fire Marshal and reserve officer in the Reidsville police department, testified at trial. His investigation revealed that on the night of the Fire, Williamson and Sports entered the Premises through the back door, which had been kicked open and bore a footprint later determined to belong to Sports. The damage pattern revealed that the deadbolt lock had

not been engaged at the time of entry.[2] (Tr. 4/12/10 at 208-09, 228.) The business had no alarm system. (Tr. 4/15/10 at 200.)

19. The Fire was reported shortly after its start, and Reidsville police officer James Michael Austin, Jr. ("Officer Austin"), was called to the scene and took custody of Sports. Both Officer Austin and Chief Harris noted that Sports had a strong odor of gasoline, and cocaine was found in one of his pockets. (Tr. 4/12/10 at 129, 226.) Subsequent tests detected gasoline residue on both Williamson's and Sports' clothing. (Tr. 4/12/10 at 225-26.) Austin noted that Williamson was mildly intoxicated, but Sports was "highly" so. (Tr. 4/12/10 at 172.)

20. Chief Harris confirmed that gasoline had been poured on the floor of the building, resulting in an extensive horizontal burn pattern that indicated an intentionally set fire. (Tr. 4/12/10 at 218-22.) He concluded that the Fire was intentionally set. (Tr. 4/12/10 at 209-10.) Chief Harris also noted a gap in the third section of the fence on the property through which persons could enter. (Tr. 4/12/10 at 246.)

21. Sports and Williamson were charged with felony breaking and entering as well as burning an unoccupied building. (See Tr. 4/12/10 at 161.) Sports was also charged with

_____

[2] According to Puckett, the deadbolt had never worked from the date he first owned Williams Trull, and the front door did not have a deadbolt. (Tr. 4/14/10 at 200-01.)

possession of cocaine. (Tr. 4/12/10 at 161.) According to Officer Austin, both Williamson and Sports denied any involvement in the Fire when taken into custody: "They were adamant that they had nothing to do with it." (Tr. 4/12/10 at 203.)

22. Sports eventually pled guilty to the charge of cocaine possession, and the arson-related charges appear to have been dismissed. (Tr. 4/12/10 at 122.) Other than the disposition of the arson charges, there is no evidence he was offered any inducement to confess or to enter his plea. Williamson, as detailed <u>infra</u> however, died of a drug overdose on December 15, 2007, before any trial or plea agreement could be reached. (<u>See</u> Ex. 7; Tr. 4/12/10 at 153; Tr. 4/13/10 at 140.)

23. No property from Williams Trull was seized from either Williamson or Sports or found along the short path they took after setting the Fire, and nothing was reported to be missing, suggesting to law enforcement that theft was not a motive for the Fire. (Tr. 4/12/10 at 228-29.)

24. Chief Harris, who was a local resident and familiar with the Premises, testified that he observed that the equipment/merchandise on display in the Williams Trull yard had decreased over the time preceding the Fire such that by the night of the Fire very few new items remained for sale. (Tr. 4/12/10 at 222-23.) This contrasted with photographs from 2004

showing a full yard of equipment and merchandise on display. (Ex. 153; Tr. 4/12/10 at 223-24.)

25.   Based on his training with the federal Bureau of Alcohol, Tobacco and Firearms ("ATF") and his observations, Chief Harris began to suspect that the Fire might be "arson for hire," i.e., employment of individuals to set a fire so the insured can collect insurance proceeds.  Factors he considers in deciding whether any fire was a result of arson for hire include (1) the financial condition of the business, (2) the absence of stock or inventory that would normally be present on the lot of a retail establishment, and (3) the absence of any evidence of theft during the fire.  (Tr. 4/12/10 at 229.)

26.   Chief Harris undertook further investigation, finding that a lawsuit had been filed against Williams Trull by GE Commercial Finance, a floor plan financing company, and that a default judgment for over $30,000 had been entered against Puckett personally in a lawsuit filed by his ex-wife.  In light of these findings, Chief Harris notified Officer Austin and the ATF that further investigation of the Fire as an "arson for hire" was warranted.  (Tr. 4/12/10 at 231-32.)

27.   Within a week of the Fire, Chief Harris requested that Federated provide all information it collected during its investigation.  Federated complied, pursuant to North Carolina law.  (Ex. 167-RR; Tr. 4/12/10 at 232-33.)  As of the date of

the trial in this case, however, the ATF investigation of the Fire remained open (Tr. 4/12/10 at 232), and no criminal charges relating to the Fire had been filed against Puckett or anyone other than Williamson and Sports.

28.  On October 15, 2007, Chief Harris and Officer Austin interviewed Puckett.  According to Chief Harris, Puckett stated that "[t]he shop and parts were doing good . . . . Sales were down, but we were doing okay."  Puckett also stated that he transferred the tractors out because he did not want to pay charges due under the floor plan, that other equipment had been transferred off the lot, and that suppliers had taken mowers off the lot.  (Tr. 4/12/10 at 235-36.)  Chief Harris testified that, based on his observations and investigation, he concluded at that time that Puckett had not been truthful about the condition of the company during this interview and thus continued his investigation.  (Tr. 4/12/10 at 236.)

### 2.  Confessions of Williamson and Sports

29.  On October 24, 2007, Williamson and Sports were released from jail on bond pending trial on their criminal charges.  (See Tr. 4/12/10 at 132.)

30.  In early November, Williamson told Officer Austin he wanted to speak with him further, and on November 9, 2007, he visited Officer Austin and confessed to his role in the Fire.

Williamson's confession, recorded by Officer Austin and signed by Williamson, provided:

> I have known Billy Puckett about a year or two. I had a friend who did some work for Billy in the past. Sometime around the First of September of this year Billy called me and said he was having some money trouble and he asked me to burn his business, Williams Trull. He said he would give me $2,000 to do it. I told him that I would do it. We talked for about an hour. He told me that he would leave the deadbolt unlocked and three gas cans at the door for us to use. We talked about it three or four days later because I hadn't done it yet. The first part of October of 2007 me and my nephew, Kenneth Sports, were in Reidsville at some friend's house and they got to arguing. We got dropped off at a bar across from Billy's business. We drink [sic] a beer and decided to go ahead and burn the business. Kenneth only knew about this because I told him a couple of nights before we did it. We didn't really plan it out. We just went over to the building and Billy had told me about a place in the fence where we could go under it. We did and Kenneth went to a door on the south side and he kicked it open. I saw the three gas cans beside the door and I grabbed one. I poured the gas throughout the building and saw that Billy had left his BMW inside. He was going to sell it the next day for $15,000.[3] He told me to take the cash drawer, but I didn't. We lit the

---

[3] As noted below, Puckett's unchallenged testimony indicates that he had a potential buyer of the BMW the day of the Fire, and the sale was to be consummated the next day. This suggests strongly that Williamson learned this information the night of the Fire or afterwards. Officer Austin testified that he had noticed that the BMW was normally kept inside the fence but had been moved inside the Williams Trull garage on the night of the Fire. (Tr. 4/12/10 at 144–45; see Tr. 4/15/10 at 191.) The parties argue different interpretations of this fact: Federated argues it is evidence that Puckett was aware of the impending fire; Williams Trull argues it is evidence that Puckett no longer needed to advertise its sale and wanted to protect it for a sale the next day – actions that it contends are inconsistent with any plan to burn the business.

fire with my lighter. I lit the fire near the hallway
where the car was. The guy that was going to buy the
BMW was a black guy but I don't know his name. We set
the fire and ran out the same door that we came in.
We ran back to the north side of the building and
crawled under the fence. We ran a short way and a
police car pulled up. He told me to stop and I did.
Kenneth kept running but he got caught, too. We had
just taken off our latex gloves and tossed them when
we got caught.

(Ex. 4; Tr. 4/12/10 at 136-37.)[4] Chief Harris provided

Federated's private investigator, Jerry D. Webster ("Webster"),

a copy of Williamson's confession statement on November 13,

2007. (Ex. 168.) Federated's other investigator, employee

Thomas Scott Eddie ("Eddie"), testified that he may not have

received a copy of the statement until February 2008, although

he may have seen it before then. (See Tr. 4/14/10 at 88.)

31. On November 20, 2007, Sports provided a confession as

well, which was recorded by Officer Austin and initialed and

signed by Sports. (Tr. 4/12/10 at 113; Ex. 5.) At trial,

Sports agreed to the contents of, and authenticated, his

confession (Tr. 4/12/10 at 101-09), which provided:

On October 3, 2007 I got off work at J&L Flooring at
5:30 PM. My baby's mother picked me up and drove me
to my mom's house in Greensboro. On the way there we
stopped at a store and I bought a 6 pack of beer. I

---

[4] At trial, the court conditionally admitted Williamson's confession
and alleged statements on the intentional burning claim as an
exception to the hearsay rule on the grounds that they contained
statements against penal interest under Federal Rule of Evidence
804(b)(3). (Tr. 4/12/10 at 143.) The scope of what is admissible as
to Williamson's alleged statements regarding the Fire and possible
arson for hire is addressed infra in the Conclusions of Law.

drank a couple of them on the way and the other 4 at
my mom's house.  My uncle, David Williamson, was at my
mom's when we got there.  We sat around for a while
and David asked if we, me and Crystal[5], wanted to go to
Reidsville.  We decided to go and Crystal drove.  We
stopped on the way and I got two 24 oz. Miller Lites.
I also got some cocaine on the way to Reidsville.  Me
and Crystal got to arguing and she dropped us off at
some bar in Reidsville.  I had never been here before
so I don't know the name of the bar.  I drank two or
three more beers at the bar and I took a hit for [sic]
the coke.  We stayed there about 30-45 minutes I
guess.  David asked me if I wanted to make some money
and I said, "Yeah, how much?"  David said $10,000.$\overline{^{00}}$
split even.  I asked how and he told me some guy
wanted to pay us to burn down his business.  David
pointed to the building beside us (at the bar) and
said that one.  I said okay and he told me to go under
the third section of the fence.  We ran around the
building and went under the fence.  We ran back to the
south side of the building and I kicked the door
twice.  It flew open and we ran inside.  I remember
running by some shelves and David told me to go back
outside and get a gas can on the left side of the
door.  I went outside and found the gas can where he
said it would be.  It was a big red plastic gas can.
I brought it inside and gave it to David.  He started
pouring the gas throughout the store and I ran back to
the door and waited.  I saw David lean over and light
the gas trail and we ran outside.  We went back to the
same spot of the fence and we crawled under it again.
We ran from the building and all of the sudden the
police up and stopped me.  I had just tossed some
latex gloves that I was wearing.  David brought the
gloves from my mom's house.

The first statement I gave you was a lie.  I lied to
you because I was intoxicated and scared.  To this day
I have not been paid any money.

(Ex. 5.)    Sports   testified   that   his   initial   denial   of

involvement on the night of the Fire was untrue and that he lied

---

[5]  At trial, Sports stated that "Crystal" should be "Krista."  (Tr.
4/12/10 at 113.)

because he was scared and was only "jiving" Officer Austin. (Tr. 4/12/10 at 109.) According to Federated's investigator Eddie, Chief Harris provided a copy of Sports' confession on January 29, 2009, (Ex. 168), although Federated's representatives may have seen the statement in early January 2008. (See Tr. 4/14/10 at 88.)

32. Officer Austin, in coordination with Chief Harris and the ATF, discussed with Williamson his wearing "a wire" during a meeting with Puckett in order to obtain evidence of a payoff by Puckett or other incriminating evidence. Williamson agreed to meet with Austin on December 14, 2007, but then postponed the meeting until December 17, 2007. As will be seen, however, Williamson died in the interim on December 15, 2007, ending any possibility of his recording any conversation with Puckett. (Tr. 4/12/10 at 152-53, 240-42.)

### 3. Evidence of Williamson's Statements to Friends and Family

33. Federated offered testimony of Williamson's friends and family who claimed that Williamson told them, both before and after the Fire, that he had been hired by Puckett to set the Fire. As discussed in the Conclusions of Law, infra, as to the intentional burning claim the court conditionally admitted portions of this testimony at trial as statements against penal

interest under Fed. R. Evid. 804(b)(3), over Williams Trull's objection. (Tr. 4/12/10 at 4-22.)

34. Williamson's mother, Brenda ("Brenda Williamson"), testified by deposition that before the Fire Williamson told her "he was going to get a lump sum of money" and could help her pay her bills. (Brenda Williamson Dep. at 26, 28, 37-38, 42-43.) She told her son she hoped he was "not doing anything stupid," and he just grinned. (Id. at 28.) She also testified that he told her after the Fire that he burned the Premises for money and did it because he had "seen money signs." (Id. at 23-24.) Once she discovered that he had committed the arson, she urged him to confess to "get things right." (Id. at 47.)

35. Erin Kathleen Paton ("Paton"), the unwed mother of Williamson's two children, testified at trial. At the time of trial she worked at Carolina Bank processing mortgages while attending college. She had known Williamson for several years and had an on- and off-again relationship centered principally on their two children. She stated that Williamson called her "a lot" from jail after he was arrested for setting the Fire. She stated that in one of the conversations over Williamson's three-week period of incarceration he told her that "he and his nephew burnt down the building and that a man named Billy Puckett had hired him to do it and was going to give him $10,000 for doing it." (Tr. 4/13/10 at 143-44.) She further testified that

Williamson said that the money would come from insurance proceeds and that Puckett was expected to provide bail money for him and Sports but was unable to do so because Puckett was awaiting payment from the insurer. (Tr. 4/13/10 at 143-45.) According to Paton, she met with Saferight at his trailer where he lived and was provided $800 in $100 bills to be put toward Williamson's bail. (Tr. 4/13/10 at 143, 146-48.) When Paton picked up Williamson upon his release, he told her to drive him to Saferight's trailer in Brown's Summit, N.C. (between Greensboro and Reidsville), "so Bobby could get in touch with Billy to get the money." (Tr. 4/13/10 at 148-50.) She did so, but waited in the car. (Id.) Williamson went in, exited without any money, and was mad. (Id.)

36. Melissa Hazelwood ("Hazelwood"), who was Williamson's girlfriend for four years, testified that within the month before the Fire he told her he was "getting ready to come into a lot of money." (Hazelwood Dep. at 14-15.) According to her, "he didn't tell me the guy's name right offhand, but he said that he . . . was going out of business or getting ready to go into bankruptcy or something." (Id. at 15, 18-19, 42-43.) She also testified that "when he made bond," Williamson told her that "Billy Puckett was not going to pay him his money" for the burning, though she was unfamiliar with Puckett's name at the time. (Id. at 16-18, 53-54.) He further admitted to her that

19

he had climbed under the fence to burn the building. (<u>Id.</u> at 33.) The day he died, she observed Williamson with "like $500" or "$300." (<u>Id.</u> at 37, 57-58.)

37. Stacey Stickle ("Stickle"), Williamson's niece, is a 25 year-old "stay-at-home mom" with three children. She testified that she and her family discussed the details of the Fire and Williamson's death. (Tr. 4/13/10 at 130-31, 134.) According to Stickle, in mid to late September 2007 toward "early evening" as she was driving Williamson somewhere, he confided that Puckett had offered him $10,000 to burn his business because the business was "going under," stated that the money would come from insurance proceeds, and placed on the car dashboard a map of the Premises with an "x" marking the location of the door he was to enter. She says she told him the idea was "stupid" but did not believe he would carry it out. (Tr. 4/13/10 at 125-26, 135.) On cross examination she conceded she had not previously told anyone, including Federated's investigator, about the map, although it does not appear that the investigator asked about it directly. Rather, she said she had "forgotten about it" and "[i]t was so traumatic for us to lose him, you know, that that wasn't something that I was focused on." (Tr. 4/13/10 at 131.) While she and Paton had discussed the situation, she explained, the map was "something that I kept to myself." (Tr. 4/13/10 at 131.) Stickle also

testified that she met with Williamson on December 15, 2007, the day he died, and he had a "pocketful of money," which Williamson said was a "partial payment" of $5,000 (though he spent some of it), noting he was still owed $5,000. (Tr. 4/13/10 at 124-27.) Stickle also said she was present at a gathering where Williamson told his sister (her mother) and Stickle's stepfather about the money he was offered to burn down the building. (Tr. 4/13/10 at 135-36.) There was no testimony that anyone, including Stickle, her mother or stepfather, tried to dissuade Williamson from committing arson. (Tr. 4/13/10 at 135-36.)[6]

38. At trial, Sports testified that on October 3, 2007, he got off work at about 5:30 p.m. and encountered Williamson at Sports' mother's house in Greensboro. Williamson had been drinking and asked Sports if he "wanted to make any money." (Tr. 4/12/10 at 88.) Sports expressed interest but said that Williamson "didn't really explain it at the house until we got to the bar." (Id.) Williamson identified Puckett's name "a few days" after they were jailed together, yet Sports had no further discussions with Williamson after Sports' release from jail. (Tr. 4/12/10 at 98-99, 117.) On cross examination at trial,

---

[6] Williams Trull contends that in a September 11, 2009 (unsworn) interview by Federated, Stickle said that Williamson did not tell her about being paid to set the Fire until just days before he died. Suffice it to say that the transcript contains statements by her that Williamson told her about the proposition before the Fire (Ex. 174), and Williams Trull did not cross examine her about this at trial.

Sports conceded that he had told Federated's investigator he learned about Puckett from his "family members," which Sports explained included Williamson.[7] (Tr. 4/12/10 at 119-20.) Sports also testified that he believed Williamson obtained the latex gloves they used from Sports' mother, who kept them at her home in her capacity as a nurse. (Tr. 4/12/10 at 108, 114.)

39. According to Thomas Lee Davis ("Davis"), who had known Williamson for ten years, the night Williamson was released from jail Williamson told him that Puckett had agreed to pay him $25,000 to "burn a place down for insurance money." (Davis Dep. at 21-22, 37-38.) Davis later allowed it could have been $20,000, consistent with what Davis had apparently told police. (Id. at 31.) Davis testified that Williamson also told him then that "the guy that wanted him to burn the building down had left the gate unlocked and left gas there for him to set the fire with." (Id. at 62-63.) He also said that Williamson told him

_____

[7] Williams Trull argues that Sports told Webster on October 29, 2009, two years after the Fire, that he learned Puckett's name from his family members, that Williamson "never mentioned nothing to me" about Puckett, and that his family members were only speculating that the $2,000 in cash Williamson allegedly had received came from Puckett. (Ex. 174.) Although the court admitted this exhibit to show the reasonableness of Federated's investigation and not for the truth of Sports' statements, it is clear that Sports' alleged statement was made in the context of the investigator's question whether Sports had "any idea how David got involved in this initially" and "how David became associated with Billy Puckett." (Ex. 174.) It was Federated's investigator who followed up with the question, "[s]o what you have learned about the name Billy Puckett or the arrangement is that [sic] what you've learned from your family members," to which Sports replied, "[y]eah from family members." (Id.)

that the first time he got any money from Puckett was about seven days before Williamson's death, when he had collected $1,000 from Puckett, and that Puckett paid him another $1,000 the night before Williamson died. (Id. at 24-25, 28-31, 74, 82.)

40. Federated argues that the testimony of Williamson's friends and family as to Williamson's receipt of cash shortly before his death demonstrates that Williamson received a payment in return for setting the Fire. Federated contends that the $130,000 it advanced Williams Trull (including a $20,000 payment on October 19, 2007, prior to Williamson making bail, and a $20,000 payment on December 7, 2007, and negotiated four days later, just before Williamson died (Exs. 11, 11C)) was a source of payoff payments.

41. The only advance payment for which Williams Trull was not required to submit receipts was the $20,000 check dated October 19, 2007, and deposited into the Williams Trull checking account on October 22, 2007. Two days later, the checking account balance had been reduced to $633.19 and went negative the following day. Puckett testified that the $20,000 advance payment was used for the salaries of his employees "for several weeks of payroll" and electronic payments for payroll tax. (Tr. 4/15/10 at 213; Exs. 11A, 150.) Though no funds can be traced

directly from Williams Trull/Puckett to Williamson, Federated's payments were sufficient to provide a source of payment.

42. In assessing the credibility of witnesses, the court notes that the story Williamson's friends and family reported he told them was largely consistent, except for the amount of money he claimed he was to be paid. While Williamson confessed to Officer Austin that he was offered $2,000 for the Fire (Ex. 5; see Tr. 4/12/10 at 136), Williamson's friend, Davis, recalled him saying he was offered $20,000 or $25,000. (See Davis Dep. at 22, 31.) Hazelwood, by contrast, testified that Williamson told her he was going to get "between five to ten thousand dollars." (Hazelwood Dep. at 15.) Sports, in his confession, stated that Williamson said the payoff was $10,000, which they would split. (Ex. 5; see Tr. 4/12/10 at 148-49.) This is consistent with the testimony of Paton and Stickle, who both testified that Williamson told them he had been offered $10,000, and of Stickle, who testified that the day he died he had received $5,000 of a $10,000 payoff. (Tr. 4/13/10 at 124-27, 143.)

43. The court has also considered that Williamson and many of his various friends and family members, including several who testified live at trial, were engaged in a lifestyle of excessive illegal drug use and alcohol binges, some of which extended for several days. (See Davis Dep. at 67-68 (drug use

was "possibly every day").)  Moreover, for every witness who testified that Williamson told him or her that he was going to commit arson, sadly not a single one felt any compulsion to either talk him out of it or to report him to law enforcement.[8] Such is the fabric of their character, but it is just in such an environment that someone could be found to persuade to commit arson.  Consequently, the court finds that while recollections differ, the testimony is sufficiently credible to be believed as it relates to the claim that Williamson acknowledged to others his involvement in "arson for hire" for Puckett.  This is particularly true as to the testimony of Stickle, Paton, and Sports, who appeared live at trial and whose demeanor the court was able to judge; the court finds them credible as to what Williamson allegedly told them.

### 4.    Evidence of Communications Between Williamson and Puckett

44.  Federated asserts that Williamson and Puckett knew each other and spoke with one another both before the Fire and after Williamson was released from jail.  As to how they knew or may have known each other, Federated offered in part the deposition testimony of Brenda Williamson, who testified that Williamson used to work for Puckett, but no details were provided.  (Brenda Williamson Dep. at 33.)  Federated also

---

[8]  The court notes that Paton did persuade Williamson to confess.  (Tr. 4/13/10 at 152-53.)

offered evidence of Williamson's association with Saferight, who worked for Puckett. Federated argues that Puckett and Williamson must have communicated in a manner to avoid detection and offered the testimony of friends and family.

45. Paton testified that upon Williamson's release on bail, he asked her to get "on the computer" to find Puckett's telephone number because he did not like "having to go through Bobby [Saferight]" to contact Puckett and "wanted to get in touch with Billy himself." (Tr. 4/13/10 at 150-51.) According to Paton, she located Puckett's home telephone number on the Internet and gave it to Williamson, who attempted to use his cell phone to call Puckett, but got no answer. (Tr. 4/13/10 at 150-51, 156-57, 163.)

46. Paton, Davis, and Hazelwood testified that Williamson tried to contact Puckett by telephone and in person on multiple occasions after being released from jail in order to receive payment for setting the Fire. Paton testified she was present when Williamson attempted to call Puckett and on several occasions when Williamson attempted to get money by calling Saferight. Paton never saw or heard Williamson actually speak with Puckett on the phone, however. Nor did she drive Williamson to Reidsville to try to find Puckett, despite her having driven Williamson to the Reidsville police department. (Tr. 4/13/10 at 150-51, 157-58.)

47. Hazelwood testified that she was present during at least one phone call Williamson made to Saferight in which Williamson told Saferight to call Puckett to find out where his money was for setting the Fire. (Hazelwood Dep. at 36-37.)

48. Davis also said he was present when Williamson "cussed" Puckett out on the phone "because he wouldn't pay him." (Davis Dep. at 23, 89-90.) Davis estimated that Williamson called Puckett approximately thirty times between release from jail and December 15, 2007. (Id. at 71-72.)

49. Though Paton, Hazelwood and Davis testified to multiple attempted phone calls from Williamson to Puckett, Puckett's cell phone records, which Federated introduced, indicate a total of five calls to or from Williamson's cell phone: four short phone calls (one of four seconds, two of five seconds, and one of twenty seconds) from Williamson's cell phone in close proximity to one another on October 29, 2007; and a 42-second call from Puckett's cell phone to Williamson's approximately two hours later. (Ex. 18.) Neither party offered any evidence as to whether the duration of these calls, particularly the shorter ones, was sufficient for any communication to have occurred, although the 42-second call may have been. Puckett explained that he called Williamson's cell phone only because his cell phone registered missed calls from a number he did not recognize. According to Puckett, he had

business cards on his desk, and because "a lot of customers will pick them up," he surmised the missed calls were from someone trying to reach him for assistance. Because of this, he said, "[t]his [returning calls] is something that I do." (Tr. 4/15/10 at 215-16.) This explanation does not fully account for the 42-second call, however.

50. Although Puckett did not deny Federated access to his home telephone records, Federated reports that the service provider (Time Warner) refused to provide them (Tr. 4/14/10 at 134), and Puckett's home telephone records were not produced at trial. Federated claims it was unable to obtain Williamson's cell phone records. (Id.) Thus, if the testimony of Paton, Hazelwood and Davis is accurate, some of Williamson's alleged calls must have been made from and to different telephones.

51. According to Officer Austin, during his November 9, 2007, confession, Williamson retrieved his cell phone from his car and showed Austin the speed-dial list, which had an entry for "Billy P" at speed dial #79 with Puckett's cell phone number.[9] A copy of a photograph Officer Austin said he took (Tr.

_____

[9] Williamson's cell phone was inadvertently destroyed by the Reidsville police department, without Officer Austin's knowledge. (Tr. 4/12/10 at 166-67, 171.) According to Officer Austin, he had possession of the cell phone until the charges against Sports were resolved in (or around) late 2008. (See Tr. 4/12/10 at 167.) The cell phone was destroyed at some point after that, likely in 2009 or the beginning of 2010. It is not evident that law enforcement appreciated that the cell phone could be relevant to related civil litigation.

4/12/10 at 141-43) was admitted as Exhibit 6, but it showed "Billy" and not "Billy P."

52. Sometime after Williamson died, i.e., after December 15, 2007, Officer Austin obtained and brought Williamson's cell phone to the Reidsville Fire Department. Photographs of it taken by Chief Harris (introduced as Plaintiffs' Exhibit 207 (Tr. 4/13/10 at 39-42; Tr. 4/15/10 at 158-63) showed a listing for "Billy" but not "Billy P," as testified to by Officer Austin. (Tr. 4/13/10 at 39-42.)

53. An examination of Officer Austin's photograph (Ex. 6) reveals that it appears to be a copy of one of the twelve photos taken by Chief Harris (Plaintiff's Ex. 207). Thus, the photograph that Officer Austin retained appears to be the photo of Williamson's cell phone taken after Williamson's death. Williams Trull contends that the evidence suggests that Williamson or someone else altered the cell phone to support a claim to implicate Puckett. Williams Trull points out that Williamson possessed his cell phone for some time prior to showing it to Officer Austin to support his November 9, 2007 confession and that by the time Chief Harris took his photos, Paton had been using it for some time after Williamson's death. (Tr. 4/13/10 at 158-59.) The court concludes, however, that although the date Puckett's cell phone number was entered into Williamson's cell phone is unknown, the discrepancies in Officer

29

Austin's testimony do not undermine his testimony that he observed Williamson's phone at the time of his confession. More than likely, Officer Austin was mistaken about recalling that the cell phone listed "Billy P" instead of "Billy," as reflected in the photo, or that he, rather than Chief Harris, photographed the phone.

### 5. Williamson's Death

54. Late on the night of December 15, 2007, Williamson died of a drug overdose in a Guilford County motel room. The police were called to the scene around 10:00 p.m. (See Tr. 4/13/10 at 93-94.) According to a witness, Williamson had been sniffing Oxycodone (obtained from Stickle, his niece) and drinking beer as well as taking other illegal drugs. (See Tr. 4/13/10 at 132.)

55. Williamson's mother, Brenda, testified by deposition that at about 8:00 p.m. on the night of his death she and Stickle picked up Williamson from the motel and drove to a trailer she believes was Saferight's but returned to the motel when they determined that Saferight was not home. (Brenda Williamson Dep. at 16-17, 24.) His mother also testified (without objection) that her son had told her and Stickle: "Don't worry about me. After tonight, you won't have no worries." (Id. at 29-30.) Neither Brenda Williamson nor

Stickle identified any signs that Williamson had been in any altercation with anyone.

56. Williamson's friend Davis testified by deposition that he had been with Williamson the night of his death and told police that night that Puckett gave Williamson $1,000 for burning the business, which "was part of the $20,000 Puckett had agreed to pay to have the building burned." (Davis Dep. at 29-30.) Davis testified further that he learned this information directly from Williamson and not from anyone else. (Id. at 31.)

57. The court finds that Davis appeared to be under the influence of drugs and/or alcohol at critical times he allegedly observed events to which he testified, which negatively affects his ability to recall them reliably. Consequently, while his testimony may be consistent with that of other witnesses, the court concludes it is suspect insofar as it relates to recollection of specific events, and the court will not rely upon it in that regard for its decision.[10]

58. Guilford County Deputy Sheriff Tracy William Smith ("Deputy Smith") testified that upon arriving at the motel at about 9:55 p.m. on December 15, 2007, he saw what he believed were signs of a struggle: Williamson had blood around his face and mouth and appeared to have been in some kind of altercation;

---

[10] The court will rely upon Davis' testimony to the extent it confirms the close relationship between Williamson and Saferight.

the motel room door had been kicked open; and neither of his two friends (Davis or a "Mr. Holmes") had any sign they had been in a fight.[11]  (Tr. 4/13/10 at 93-101.)  Federated contends that this supports Davis' alleged statement to Deputy Smith the night Williamson died that Williamson and Puckett got into a fight "last night," meaning Friday night.  The problem is that Davis' alleged statement was recorded in Deputy Smith's report, but Davis was not examined on it in his deposition.  It is therefore hearsay, and the court denied its admission at trial.  (Tr. 4/13/10 at 119-23.)  Because of this hearsay bar as well as the court's finding that Davis lacks credibility given his significant concurrent drug and alcohol abuse at the time of the

---

[11]  Federated sought to admit into evidence a video recording from a police vehicle "dash camera" made the night of Williamson's death that was taken while Davis sat in the back seat of Deputy Smith's police cruiser.  (Ex. 203)  According to Deputy Smith, after Davis had been sitting in the cruiser for "approximately an hour, an hour and a half" (the dash camera clock reading 12:33), Davis stated "I don't know if I can help or not, but he [Williamson] got into a fight with a guy named Billy Puckett last night.  He owns a tractor shop in Reidsville. . . . He is supposed to be going to court over that."  (Ex. 203; Tr. 4/13/10 at 100, 109, 111-12.)  Davis also stated that Puckett gave Williamson $1,000 "last night for burning his building."  (Ex. 13 at GCS0039-40.)  Federated offered Davis' statements as "excited utterance" exceptions to the hearsay rule pursuant to Fed. R. Evid. 803(2), and the court deferred ruling.  The court concludes that the statements do not qualify as excited utterances and should not be considered, particularly given the extended lapse of time between Williamson's death and when Davis allegedly made them, resulting in them being "merely . . . made after the happening of an event and when sufficient time had elapsed for reflection."  United States v. Mountain State Fabricating Co., 282 F.2d 263, 266 (4th Cir. 1960) (finding statement made a half-hour or more after the event not spontaneous declaration); see Morgan v. Foretich, 846 F.2d 941, 946-47 (4th Cir. 1988) (setting forth standard and factors to consider).

events, the evidence of any fight with Puckett is insufficient. The court therefore assumes, without deciding, that on Friday night, December 14, 2007, Puckett attended the high school basketball games of his daughter and son, which did not end until after 9 p.m., and that during that time he could not have been involved in any alleged fight. (Defendant's Ex. 208; Tr. 4/15/10 at 175-76, 218-20; Tr. 4/16/10 at 27.)

### 6. Bobby Saferight

59. Both parties implicate Saferight in the Fire. Federated argues that he served as a liaison between Williamson and Puckett. Williams Trull suggests that he had his own motivations to collect insurance proceeds to be paid for damage to his tools during the Fire.

60. Saferight worked at Williams Trull in the repair department with his uncle Hinshaw. Both men filed claims with Federated for Fire damage to their tools and tool boxes. Saferight's claim was for approximately $20,000. (See Saferight Dep. at 72.) No evidence was presented that it had been paid in any amount. (Cf. Tr. 4/14/10 at 106-08, 147, 157-58.)

61. At his EUO, Saferight concealed and downplayed his knowledge of and friendship with Williamson. When asked twice if he knew Williamson, Saferight replied "Not a Williamson" and "Not no [sic] Williamson." (Saferight EUO at 38.) Given the

context, it was clear that the inquiry was about Williamson. He denied knowing Sports as well. (Id.)

62. At his deposition on September 30, 2009, when Saferight was confronted with evidence that he had indeed known Williamson, Saferight tried to explain his previous denials by stating that he had known Williamson as "D.A." and asking if Williamson's last name was "Williams." (Saferight Dep. at 69-70.) This is unconvincing. Substantial evidence indicates that Saferight and Williamson were well-acquainted.

63. For example, there is evidence that Williamson and Sports stopped by Saferight's home a few hours before the Fire. The parties stipulated that Krista McGraw (Sports' "baby momma") would testify that she drove Williamson and Sports from Greensboro to the sports bar next to Williams Trull on the night of the Fire. According to her, "[o]n the way to Reidsville, they went by a trailer in Browns Summit. She did not go in the trailer." (Doc. 113.) Brown's Summit, of course, is where Saferight's trailer was located. (E.g., Tr. 4/13/10 at 127, 147, 149.) This is also consistent with Sports' testimony that he and Williamson stopped in Brown's Summit to get some cocaine, and with the testimony of Williamson's former girlfriend, Hazelwood, who confirmed that Williamson and Saferight were very close friends who talked daily on the phone and that she observed Saferight supply Williamson with cocaine. (Hazelwood

Dep. at 22-23, 28-29.) In addition, Williamson visited Saferight upon being released from jail, before the EUO testimony (Tr. 4/13/10 at 149-50), and even Saferight acknowledged – in his unique way – how he and Williamson knew each other.[12] Further, Brenda Williamson testified that her son stayed at Saferight's home from time to time and that Saferight drove him back and forth to work.[13] (Brenda Williamson Dep. at 17-21.) Saferight admitted as much at his deposition. (Saferight Dep. at 18-23.) According to Williamson's mother, Williamson attempted to see Saferight the night Williamson died. (See Brenda Williamson Dep. at 16-17.) Finally, Saferight attended Williamson's funeral on December 19, 2007. (Tr. 4/13/10 at 130; see Ex. 10 at 15.)

64. In addition, Saferight was the approximate age of Williamson and Sports,[14] had grown up in the Greensboro area, and had a criminal drug history. It was Eddie's discovery of these

---

[12] Saferight described his relationship with Williamson as "going to stay with a girl, come back, drink, get drunk, pass out, do – you know, the same, old, normal, everyday thing." (Saferight Dep. at 71.)

[13] Davis also acknowledged that Williamson and Saferight were "pretty good friends." (Davis Dep. at 34.) This is an admission that does not depend on Davis' sobriety, and the court thus credits it.

[14] Although Williamson was Sport's uncle, the two were nearly the same age – in their mid-twenties. (See Ex. 7 (Williams's death certificate); Tr. 4/12/10 at 87 (Sports testimony of his age two-and-one-half years after the Fire).) According to Stickle, because of his relatively young age Williamson was more like a brother to her than an uncle. (Tr. 4/13/10 at 124.)

facts that led him to suspect a connection between Saferight and the arsonists. (Tr. 4/14/10 at 58-59.)

65. Thus, by the time of his January 9, 2008 EUO, Saferight knew Williamson's true name. Based on Saferight's answers at his EUO, his earlier attendance at Williamson's funeral, and other evidence as described herein, it is clear that Saferight testified falsely at his EUO and was attempting to conceal his relationship with Williamson.

66. Federated also points to an ominous warning by Saferight's uncle before the Fire. "[S]everal weeks before the Fire," Hinshaw warned Farlow to remove her personal belongings from the business "because something was going to happen" there. (Hinshaw Dep. at 30.) When asked about this in his deposition, Hinshaw explained that he was just reflecting his concern that the business would be shut down. (Id. at 31.) Federated draws a more sinister inference and argues that it demonstrates awareness of Saferight's involvement in planning the Fire for Puckett.

### 7. Williams Trull's Financial Condition at the Time of the Fire

67. As noted, the financial condition of an insured is a key consideration in determining whether the insured had a motive to commit or facilitate arson. By any measure, Williams Trull was in financial distress. In fact, by the time of the

36

Fire, it was insolvent. Whereas a healthy company's assets exceed its debts, Williams Trull's debts exceeded its assets by a factor of 2.4. (Tr. 4/15/10 at 9.) Its financial condition was sufficient to provide a substantial motive to arrange the Fire.

68. The details of the company's overall financial health following Puckett's purchase of it, including its accelerated decline in 2006, is addressed <u>infra</u> in the court's analysis of Federated's misrepresentation defense. For purposes of the intentional burning defense, the court finds that the company's net income had declined from a loss of over $7,000 in 2005, to a loss of over $89,000 in 2006, to a loss of over $862,000 for the nine months ending September 30, 2007. (Ex. 125; Tr. 4/15/10 at 9, 38-40.) Though in the first nine months of 2007 Williams Trull had sales of $1,336,939 (which annualizes to slightly less than $1.8 million) (<u>see</u> Tr. 4/15/10 at 140), its cost of sales grossly exceeded its sales (<u>id.</u> at 143). In other words, the company was selling equipment below its cost, so that the more that was sold, the greater were its losses. (<u>Id.</u>)

69. Significantly, Williams Trull had sold multiple pieces of equipment "out of trust" in 2006 and 2007, meaning it had accepted payment from the customer but spent the money elsewhere instead of timely paying the finance company or the manufacturer. This constituted a fundamental breach of the

financing arrangements. The amounts were substantial. By September 30, 2007, after all (or virtually all) equipment had been repossessed by suppliers, Williams Trull still owed over $400,000 to the financing companies. (Tr. 4/15/10 at 24-30.) Increasingly, Williams Trull had become more desperate for cash. In the spring of 2007, Puckett applied for, but was turned down for, a loan from the Small Business Administration. (Tr. 4/15/10 at 15-16.) In about July 2007, Puckett sold all his personal stock in United Parcel Service, his former employer for 20 years. (Tr. 4/15/10 at 16.) As lending sources dried up, Williams Trull was forced to obtain financing from Venture Bank, a venture capital company that made unconventional loans to high risk borrowers, at the exorbitant interest rate of 121 percent. (Tr. 4/15/10 at 12-13.) The lender swept Williams Trull's bank account weekly in the amount of $2,500 for payments. (Tr. 4/15/10 at 13.) In the three months preceding the Fire (July, August, September 2007), up to 57 Williams Trull checks were either paid by the bank as overdrawn or returned for lack of sufficient funds. In the three days preceding the Fire (October 1-3, 2007) at least 26 additional checks were paid by the bank as overdrawn or returned for lack of sufficient funds.[15] (Tr.

---

[15] Leslie W. Robson, who evaluated Williams Trull's financial condition at the request of Federated, testified that 31 checks were either paid by bank overdraft or returned for nonsufficient funds during the first three days of October 2007. (Tr. 4/15/10 at 11-12, 37.) The bank statements on which he relies (see Doc. 150), indicate

4/15/10 at 11-12, 37.)    By the end of September 2007, the company's bank account was negative (-$6,933).  (Tr. 4/15/10 at 11.)

70.    Not only was Williams Trull's past bad, its future was bleak.    After months of delinquencies dating to 2006, its relationship with Case, one of its suppliers, was terminated in May or June 2007.  (Puckett EUO at 44-46; see Tr. 4/13/10 at 167-68.)  By the time of the Fire, not only had all of Williams Trull's suppliers and floor plan financers repossessed equipment, they had refused to provide any more in the future. In fact, the last supplier's removal of equipment occurred just five days before the Fire.  Williams Trull's debt was growing and was unsustainable under even the best of realistic projections.  For example, in the six to seven months following the Fire, the company was projected to lose another $205,564. (Tr. 4/15/10 at 35.)    The company's debt was so steep that Puckett was forced to borrow on behalf of the company using his personal credit card.  (Tr. 4/15/10 at 13.)

71.    Puckett's employees observed that he was under considerable financial stress (Amanda Farlow Dep. at 70; Tr. 4/13/10 at 188-89), which included personal financial pressures that had been building up to the time of the Fire.  (Tr. 4/15/10

---

31 checks for October 1-4, 2007, with 26 checks for the first three days of October 2007 and 5 checks for October 4, 2007, the day after the Fire.

at 10.) Puckett had personally guaranteed a number of the company's loans and floor plan financing arrangements, and although the precise amount of his net exposure on the guaranties is unclear on this record, his guaranties included the FNB loan that held a September 30, 2007, balance of $182,521. (<u>See</u> Exs. 167-WW, 167-XX, 167-ZZ; Tr. 4/15/10 at 10, 17.) He also personally owed $20,050 on credit card balances (on which he paid on average only $2.64 above the monthly minimum balance). (Tr. 4/15/10 at 65-66.) In addition, he owed his ex-wife a substantial sum pursuant to their property settlement, having obtained a second mortgage on the family farm to pay $100,000 to her and having given her a $200,000 promissory note for the balance, payable at $25,000 per year. By the time of his EUO, he was a year behind on these payments and his ex-wife had obtained a $25,000 judgment against him (plus attorneys' fees and interest). (Tr. 4/15/10 at 181; Puckett EUO at 24-27; Ex. 167-FFF.) Even on a daily basis Puckett was underwater; his fixed living obligations and expenses exceeded his income by $1,755 a month. (Tr. 4/15/10 at 10.)

### 8. Williams Trull's Evidence and Arguments in Response

72. Williams Trull advances several arguments in support of its defense of Federated's claim that it procured the Fire.

73.   Williams   Trull   first   points   to   Puckett's   trial
testimony.   Puckett testified that on the night of the Fire he
left work at about 5:30 p.m., went to the gym, and then to
Covington   Wesleyan   church   (about   five   miles   away)   for   the
Wednesday   night   service.   (Tr.   4/15/10   at   198-99.)   He   left
church about 8:30 p.m. and was at home when he received a call
from law enforcement about the Fire at about 11:30 p.m.   (Tr.
4/15/10 at 199.)

74.   Puckett   denied   any   involvement   in   the   Fire   and
specifically   denied   communicating   with   Williamson   or   anyone
else, including Saferight, about setting the Fire:

> Q    In   one   of   the   statements,   Mr.   Williamson's
> statement, I think it said that you and Mr. Williamson
> had been friends for a year or a year or two.  Are you
> friends with Mr. Williamson?
>
> A    No,   sir.    I've   never   known   the   individual   and
> never had any dealings with him at all.
>
> Q    When   you   say   "never   had   any   dealings":   --   you
> said you didn't recognize his picture.  Did you ever
> talk to him, maybe not face to face?
>
> A    No, never talked to him at all.
>
>  . . .
>
> Q    Okay.    Did   you   ever   call   Mr.   Williamson   from   a
> pay phone?
>
> A    No.
>
> Q    Did   you   ever   get   a   message   somehow   to   Mr.
> Williamson   that   you   wanted   someone   to   burn   your
> building?

A     No, sir.

Q     Did you ever talk to anybody – did you ever ask
anybody else whether they would burn the building if
they got some money?

A     No, sir, not at all.

Q     Did you ever suggest to somebody, well, if this
building goes, there may be some money in it?

A     No.  No.

Q     Okay.  Have you ever said that – I am going to be
specific – to Bobby Saferight?

A     No, sir, never.  Never said that to anybody.

. . . .

Q     If there's been testimony that you asked Mr.
Saferight, he said, no, but said I got somebody who
will, would that be truthful?

A     No, that would not be truthful because I never
talked to anyone about doing that.

(Tr. 4/15/10 at 215-17.)  Puckett also denied that he ever gave

Saferight cash to "take care of whoever torched the building."

(Id. at 217.)

    75.  Federated did not cross examine Puckett at trial on

his alleged involvement in the Fire, but rather relied on his

deposition and EUO testimony.

    76.  Next, Williams Trull addresses motive and contends

that Puckett was actively engaged in building a future for the

company.  In the summer of 2007 (approximately July), it hired

Greg Price ("Price"), a business consultant with International

Profit Associates, to analyze the company's performance and implement procedures to make it profitable. (Puckett EUO at 58-59.) Price worked at Williams Trull for about six weeks and was paid approximately $50,000. (Tr. 4/15/10 at 188.) Williams Trull notes that Price never advised Puckett that he should close the business. (Tr. 4/15/10 at 189.) However, Price's analyses would have demonstrated to Puckett that his business was in dire straits, and it resulted in several cost-cutting measures. For example, Price's advice led to the aforementioned dismissal of Deborah Hinshaw and Bob Saferight in August 2007. (Puckett EUO at 58-61; Saferight Dep. at 34.)

77. Third, as noted, Puckett endeavored to keep Williams Trull operating immediately after the Fire through the rest of 2007. (See Tr. 4/15/10 at 208-09.) In fact, Puckett's father continued to report to the Premises until two weeks before trial "in case somebody, a customer, would come by," even though the business was effectively closed. (Tr. 4/15/10 at 194.) Federated responds that because the arsonists were caught leaving the scene, Puckett was pressured to carry on as if he had no involvement in it. It also argues that it is not inconsistent with arson for Williams Trull to have endeavored to remain in business only to sell parts and service, using insurance proceeds to pay down creditors.

78.  Fourth, the Fire was set when Puckett had one of his dogs on the Premises.  The dog, "Cougar," was a part-German Shepherd named after the mascot for the high school at which Puckett's daughter attended.  (Tr. 4/15/10 at 189-90, 203.) Puckett testified that at his daughter's urging the prior March/April, he acquired Cougar as a puppy from his daughter's high school classmate/softball teammate.  (Tr. 4/15/10 at 189-90.)  Though the dog originally lived at Puckett's house, Puckett had been keeping it at the business since May 2007, because it did not get along with his dogs at home.  (Tr. 4/15/10 at 190.)

79.  Williams Trull offered evidence that Puckett cared for the dog.  After arriving at the Premises the night of the Fire, Puckett told the firemen that his dog was inside.  (Tr. 4/15/10 at 199, 202.)  While still fighting the fire, the firemen located the dog in Puckett's office lying under his desk.  The dog was no longer breathing but was slowly revived with assistance.  (Tr. 4/15/10 at 203.)  Officer Austin observed CPR being given to a small puppy when he arrived at the scene the night of the Fire.  (Tr. 4/12/10 at 127.)  After the Fire, Puckett took Cougar to live with Puckett's pastor.  (Tr. 4/15/10 at 203.)

80.  Fifth, Williams Trull notes that the Fire damaged Puckett's BMW automobile parked in the Williams Trull building

that evening.   Puckett drove two vehicles and parked whichever vehicle he was not driving home in the Williams Trull building overnight.   (Tr. 4/15/10 at 191.)   Shortly before the Fire, the BMW had been parked in front of the building during the day with "For Sale" signs listing a sales price of $15,000, and anyone nearby would have been aware of the automobile and the asking price.   (Tr. 4/15/10 at 191-92.)   Puckett testified, without contradiction, that on the day of the Fire he had agreed to sell the BMW to a man who had previously examined and test-driven the car.   (Tr. 4/15/10 at 192-93.)   The buyer returned the BMW from a test drive, including a stop at a credit union, at about 4:30 p.m. the day of the Fire, and it was parked in the Williams Trull building.   (Id.)   As the buyer departed, Puckett told him that he would clean up the car and have it ready for him in the morning.   (Tr. 4/15/10 at 193.)   Williams Trull argues that it would have made no sense for Puckett to have put the BMW in the same building he planned to have burned.   Puckett insured the BMW through, and made a claim to, Farm Bureau Insurance Company, which eventually paid the claim.   (Ex. 167-AA; Tr. 4/13/10 at 14-15, 252-53.)

81.   Sixth, Williams Trull argues that Eddie admitted he had no evidence that anyone ever saw Williamson and Puckett talking or that they had ever met face-to-face.   (Tr. 4/14/10 at

131-33.) Eddie also testified that he had no additional evidence that Puckett knew Sports. (Tr. 4/14/10 at 128.)

82. Seventh, though Federated argues Puckett initially submitted an inflated claim for lost business income of over $1 million, Puckett did not submit any lost income claim until after having been requested twice by Federated to include lost business income in its proof of claim. Williams Trull argues that this is inconsistent with a desire to defraud Federated for lost profits.

83. Eighth, Williams Trull argues that it and Puckett were not the only ones with a financial motive to arrange the Fire. It points to Saferight, who filed his claim for $20,000 in damages to his tools and tool box and who knew, but lied about his relationship with, Williamson. Saferight and his uncle, also an employee of Williams Trull, engaged in several conversations with Federated about the status of their claims. Federated advised Saferight that his claim was under investigation and that no decision would be made until the investigation was resolved. (Tr. 4/14/10 at 147-48.) Federated did not direct anyone to investigate Saferight's affairs, (Tr. 4/15/10 at 103), and as of the date of trial neither party had provided any evidence that Saferight's claim had been paid.

84. Williams Trull argues that Reidsville law enforcement did not sufficiently investigate Saferight's role in setting the

Fire.  It points to Chief Harris' admission that he did not know who Saferight was, never attempted to speak with him, and did not "know a whole lot of information about him."  (Tr. 4/13/10 at 45-46.)  Williams Trull also notes that Federated has not required Saferight, who made an oral claim, to complete a proof of loss for his tools and tool box.  (Tr. 4/14/10 at 107-08; see Tr. 4/15/10 at 103.)  Further, Federated's investigator Webster, who interviewed a number of individuals regarding the Fire, did not attempt to interview Saferight.  (Tr. 4/14/10 at 25-26.)  Federated responds, of course, that it did examine Saferight under oath twice: once in his EUO and once in his deposition, and that both demonstrated his lack of truthfulness.

85.  In summary, as to the arson for hire claim, the court's determination of whether Williams Trull, through Puckett, was responsible for the setting of the Fire depends in large part on the court's admission of Williamson's alleged statements, which is addressed infra in the Conclusions of Law.

86.  The court turns next to the evidence as to Federated's second defense of alleged material misrepresentations and omissions.

## F.    Federated's  Second  Defense:  Alleged  Material Misrepresentations and Omissions

87.  As an alternative, independent ground for voiding the Insurance Contract, Federated asserts that Puckett, on behalf of

Williams Trull, misrepresented and omitted material information during the course of Federated's investigation. Specifically, Federated points to Puckett's statements made during the following: (1) a conversation between Puckett and Federated's investigator, Webster, on October 17, 2007, two weeks after the Fire ("Webster interview"); (2) a recorded telephone interview of Puckett by Eddie on October 25, 2007 ("Eddie interview"); and (3) Puckett's EUO on January 10, 2008, about two months before the commencement of this action. There is no transcript of the Webster interview, Puckett's statements from the Eddie interview were transcribed and testified to by Eddie, and the EUO was transcribed by a court reporter.

### 1. Cooperation of Williams Trull with the Investigation

88. Before examining Puckett's specific responses which Federated asserts are material misrepresentations or omissions, it is important to consider the financial information available to Puckett and Federated at the time of the questioning as well as Puckett's level of cooperation during the investigation.

89. By the time of the Webster interview on October 17, 2007, Puckett had already made his certified public accountants and their files available to Federated for examination, and he knew that those professionals had been in contact with Federated representatives. (Ex. 167-AA.) Indeed, in a memorandum to

Costello and others, Eddie noted that as long as Federated had a certified public accountant involved, "that should answer most of our questions."[16] (Ex. 167-S.)

90. On October 19, 2007, Puckett consented to release of credit and financial information. (Tr. 4/14/10 at 42-43; Ex. 189.) Federated used Puckett's consent to investigate both Williams Trull and Puckett. (Tr. 4/14/10 at 43.) Puckett also provided the names and telephone numbers of his contacts at Williams Trull's primary suppliers, including Cub Cadet and Case (the latter also known as International Harvester). (Exs. 167-GG, 198 at FIC0004637; see Tr. 4/13/10 at 176.) Puckett also produced tax returns and financial documents, which broke out by name the creditor of each Williams Trull promissory note. (Tr. 4/14/10 at 101-02.)

91. Federated engaged Leslie W. Robson ("Robson"), president of Robson P.C., a forensic accounting firm, to evaluate Williams Trull's loss of business income claim, extra expense claim, and the company's financial condition generally. By late October 2007, Williams Trull had provided Robson certain financial information. Based on his review, Robson determined

---

[16] During the Webster interview, Puckett admitted to having asked Federated about his Insurance Contract policy limits, claiming not to have known them and simply inquiring as to his options. (Tr. 4/15/10 at 208.) Federated interprets this inquiry as evidence of his involvement in the arson. The court does not draw this same inference.

that Williams Trull's business income loss, if any, would be minor. (Ex. 167-BB.)

92. It is also noteworthy that Puckett participated in the October 25 telephone interview with Eddie while at home and without access to Williams Trull's files. (Ex. 78 at FIC0008801.) At one point in the interview, for example, Puckett stated, "I don't have[,] I'm sorry I can't be accurate, I just don't have any of that stuff here at home with me." (Id. at FIC0008812.) In reviewing the Eddie interview as a whole, it is clear that Puckett made plain that he was providing answers without the benefit of access to the company's files and details provided therein.

93. Further, Puckett called Federated and volunteered to Costello that Farm Bureau Insurance, which insured Puckett's damaged BMW, was investigating his insurance claim for damage to it. (Ex. 167-AA.)

94. Robson worked with Williams Trull's accountant to gather information for his forensic financial analysis. (Tr. 4/15/10 at 8.) Williams Trull also gave permission for Federated to contact Williams Trull's business consultant, Price, with whom Williams Trull consulted in mid-2007. (Ex. 26.) At Federated's request, Puckett provided certain records at his EUO, including cell phone records for September through November 2007. (See Puckett EUO, Ex. 36). Robson testified

that Williams Trull never refused to provide him with a document he requested. (Tr. 4/15/10 at 126.) While Puckett's cooperation on behalf of Williams Trull to this extent was required by the Insurance Contract, Williams Trull argues it is inconsistent with any intent to mislead Federated. (See Ex. 1, Doc. 109-4, Form No. CP 00 10 04 02, § E.3.a(8).)

95. During his EUO, Puckett repeatedly stated that he did not know the answer to various financial questions and deferred to his accountants, whom he stated might know. (Puckett EUO at 56, 96-97, 101, 109-12, 127, 226.) It is clear that Puckett was relatively unsophisticated in business matters and relied on his employees, accountants, advisor Price, and Williams Trull's outdated computerized accounting system with respect to accounting and recordkeeping. (E.g., Tr. 4/15/10 at 181-82.)

96. The computerized accounting system, known by its brand name "Challenger," was approximately twenty years old, was difficult to operate, and, according to the testimony of Puckett and others, lived up to its name, challenging those who used it to track inventory, receivables and operations. (Tr. 4/15/10 at 184-85; Puckett EUO at 73; Tate/Barham EUO at 46-47, 78.) The difficulty of the Challenger system, and Puckett's inability to use it, is reflected in Puckett's apparent surprise at seeing a report Robson prepared using the Challenger system (after having received training from a Puckett-referred representative of

Challenger).  Puckett claimed never to have seen such a report. (Puckett EUO at 73, 120.)

97.  Further, Puckett's former financial assistant, Joey Steele Flinchum ("Flinchum"), testified that her predecessor had not been making entries into the Challenger system about two years prior to the Fire and that she "kind of felt sorry for Billy [Puckett] because he was unaware of how messed up the financials were [at that time] – he didn't know that this stuff [details of company operations] was not being entered [on the computer]."  (Tr. 4/13/10 at 182.)

98.  With this background in mind, the court turns to the nine areas of questioning to which Federated points as the bases of its misrepresentation and omission defense.

### 2.  Overall Financial Condition of Williams Trull

99.  Most of the questions Puckett answered related to Williams Trull's financial condition during 2007, especially the summer and fall.  However, as of the October 25, 2007 Eddie interview (Ex. 78) and Puckett's January 10, 2008 EUO, Puckett had not received the final annual report for 2007.  (Tr. 4/15/10 at 120-22.)

100.  Eddie asked whether "income was exceeding expenses," to which Puckett replied, "Yes.  I mean some months it would exceed it, some months we'd break even."  Puckett added: "With Cub Cadet we were 550% above last year."  (Ex. 78 at

FIC0008814.) He also stated that "even though its [2007] been a terrible year because of this drought we ah the parts department and service department was, was doing quite well." Those departments, Puckett stated, "were keeping us going" and the business was "making it." (Id. at FIC0008814.)

101. Puckett made similar statements at his January 2008 EUO that Williams Trull was breaking even or was close to it throughout 2007. (Puckett EUO at 59.) When shown Robson's calculation that the company had lost $267,518.03 at some point during the year, Puckett responded that there was "no possible way that could happen, because with Cub Cadet this year, I was 550 percent above what we did last year." (Id. at 88.)

102. Robson testified that his investigation revealed that Williams Trull was "not making it" and was "in deep financial distress, on the verge of collapse." (Tr. 4/15/10 at 62.) Whereas Williams Trull had projected total annual revenues of $2,009,555 for 2007 (Ex. 159), during the nine-month period from January through September 2007, Robson testified, expenses had exceeded income by $862,000. (Tr. 4/15/10 at 9, 32; see Ex. 188.) Federated also points to Hinshaw's testimony that Puckett had conceded to him sometime before the Fire, "Yeah, we're losing money" – referring to the shop (although Puckett also said on other occasions they were making money). (Hinshaw Dep. at 45-46.)

103. Similarly, Federated cites as a misrepresentation Puckett's EUO statement that in "the first two months that I was back there in service managing [having dismissed the prior service manager], we doubled what they had been doing previously in the past few months." (Puckett EUO at 61.) According to Robson, this statement was inaccurate in that during the two months before Puckett took over service management (June and July 2007), parts sales and service were $42,153 and $50,156, respectively, while once Puckett took over (August and September 2007) the "parts and service sales" were $43,284 and $26,873, respectively. (Tr. 4/15/10 at 80.) Puckett did not specify that the doubling was in "parts and service" rather than service alone, however, and he indicated that the two were separate departments. He did state that "the parts department and service department was, was doing quite well." (Ex. 78 at FIC0008814.)

104. While Puckett knew that Williams Trull was suffering financially, it is not clear the extent to which he appreciated the granular details of the company's net income deficit, as Federated claims. For example, Eddie acknowledged that during his interview Puckett did not distinguish between operating expenses and fixed expenses. (Tr. 4/14/10 at 123-24.) Rather, Puckett, who never had any business training, seemed to have a limited understanding of even the most fundamental business

concepts. For example, Robson identified Williams Trull's continued heavy discounting of equipment in order to foster sales as a significant problem. In Puckett's view, however, even though Williams Trull was operating at a loss with every product sold, Puckett planned to make up for it through volume. This, of course, was a recipe for failure and explains the company's extensive 2007 loss despite higher sales.

105. Robson admitted that Williams Trull's operating income for all of 2007 up to three days before the Fire was sufficient to cover the company's *operating* expenses. (Tr. 4/15/10 at 140.) The company was able to cover its operating expenses, however, because it was selling equipment out of trust and withholding hundreds of thousands of dollars from its vendors. While it is true that sales (of new equipment) in 2007 met or exceeded sales of the previous year, at least until a drop off in September 2007,[17] (Tr. 4/15/10 at 141-43), for Puckett to state that Williams Trull's income exceeded its expenses or was breaking even reflects either a total failure to understand the fundamental financials of his business, despite his use of professional accountants and a retained financial consultant, or a misrepresentation.

---

[17] Parts sales, however, suffered a decline of anywhere from $150,000 to $250,000 in 2007 (on an annualized basis). (See Ex. 188 (listing 2006 parts sales of $653,853; and parts sales for first nine months of 2007 as $304,853, which annualizes to $406,471).)

106. The court finds that Puckett's statement that the company's income was exceeding expenses or broke even was false. It is unclear, given Puckett's rudimentary business acumen as well as the other information Puckett disclosed, whether the statement taken in the total context was an intentional misrepresentation, however, and the court declines to so find.

### 3.   Credit Card Debt

107. During the Eddie interview, Puckett was asked whether any of his personal credit cards had "any huge outstanding balances," and he replied, "No, and they're all up-to-date." Federated contends this was false, as Robson testified that Puckett had over $20,000 in personal credit card debt and that monthly payments were on average at the minimum or just above the minimum. (Tr. 4/15/10 at 65-66; see Ex. 78 at FIC0008816.)

108. Eddie did not define what constitutes "huge," and Puckett's statement that "they're all up-to-date" could reasonably be interpreted to refer to the required payments being current rather than for the total owed. Payments were being made monthly, as required, albeit at or slightly above the monthly minimum. (Tr. 4/15/10 at 66.) Thus, Puckett's reply is not inconsistent with a possible interpretation of the request.

109. Federated points out, however, that when asked if Williams Trull had anything "huge, say over $500" on a credit card, Puckett responded "I don't think so. I don't well let's

see I got one statement right here, this one . . . If there is any like that you know it's just me personally its nothing to do with business." (Ex. 78 at FIC0008813.) Eddie testified that, with further investigation, Federated learned that Williams Trull had a Shell credit card with a $4,000 balance. (Tr. 4/14/10 at 53.) But Puckett had disclosed the Shell credit card and its $4,000 limit during his interview. (Tr. 4/14/10 at 130-31; see Ex. 78 at FIC0008813.) So, Puckett's statement was not a misrepresentation.

110. Robson testified that there was also a Bank of America credit card debt of $8,339.42 which, as of October 22, 2007 (almost three weeks after the Fire), "was late." Robson initially testified that, of this, $4,652 was reflected in Williams Trull's accounts payable, leading Robson to conclude this was a credit card for business purposes. But Robson then corrected his statement by testifying that the $4,652 was owed on Puckett's personal Discover card, not a Williams Trull account, although Williams Trull "had picked that up as an account payable" in its financial records. (Tr. 4/15/10 at 61-62.) This indicates that Puckett was advancing funds for Williams Trull. Given that Eddie's question related to *Williams Trull's* credit card, however, the court does not find Puckett's response misleading.

### 4. Termination of Dealership Agreements

111. Federated points to several of Puckett's statements regarding Williams Trull's relationship to its suppliers around the time of the Fire. Federated asserts that Puckett misled it to believe that his suppliers were continuing when in fact they had terminated or "effectively terminated" their agreements with Williams Trull. Because Williams Trull's ability to continue to obtain equipment for sale would have an obvious impact on its business, with respect to both continued operations as well as potential lost income from the Fire, this is a material area of inquiry.

112. First, in response to the question "what brand are you, are your major brands there," Puckett told Eddie: "Ah McCormick ah Cub Cadet, Ferris, Bush Hog." (Ex. 78 at FIC0008802.) When asked if he was "pretty much using the same suppliers that the prior owner was using," Puckett responded "yes." (Id. at FIC0008802, 0008804.) Eddie also asked if Williams Trull "had any problems with [the suppliers] recently in the past year or so not being able to supply you with product or anything?" Puckett responded in the negative, stating that "this time of year" (i.e., in the fall) the suppliers will "run out of certain things but ah usually you can fill an order with something else." He concluded by noting that the 2008 inventory would be coming out soon. (Id. at FIC0008805.)

113. Eddie testified that these series of answers led him to believe that "getting product from his suppliers was not an issue" and that Williams Trull would be receiving further inventory. At the time of the October 25, 2007, interview, Eddie did not know that Williams Trull was unable to sell products from the manufacturers listed by Puckett. (Tr. 4/14/10 at 49.) And his further investigation showed there were "major problems with getting product from suppliers." (Tr. 4/14/10 at 50-51.) Eddie and Robson learned that all of the company's suppliers had terminated or effectively terminated their dealership agreements, and thus Federated contends Puckett's statements were misrepresentations. (Tr. 4/14/10 at 48, Tr. 4/15/10 at 56.)

114. To the extent the question focused on suppliers being unable to supply Williams Trull, the phrase "not being able" is ambiguous. The suppliers were able, but apparently unwilling, to do so due to Williams Trull's difficulties. Williams Trull certainly had had "problems with" these suppliers, but the question was phrased in terms of the *suppliers* being unable to supply Williams Trull. In fact, that is the question Puckett answered, as demonstrated by his reference to *suppliers* running out of equipment that time of year. (Ex. 78 at FIC0008805.)

115. It is true that by the time of the Fire, Williams Trull was no longer a dealer for Case. (Tr. 4/13/10 at 168.)

However, Puckett did not list Case in his response to Eddie.
Indeed, in Puckett's EUO, he told Federated that Williams
Trull's agreement with Case had been terminated as of May 2007.
(Puckett EUO at 44-46.)   This was confirmed by Puckett's
assistant, Wilkerson.   (Tr. 4/13/10 at 164-69.)

116. The evidence also showed that Williams Trull was able
to obtain Cub Cadet parts through Cub Cadet's website by paying
cash, Bush Hog equipment from a Greensboro dealer, and Case
parts through another dealer even after Williams Trull ceased
being a Case dealer.   (Puckett EUO at 48; Tr. 4/13/10 at 176;
Tr. 4/15/10 at 214.)   Thus, the court cannot say that Puckett's
statement was misleading.

117. Next, Federated points to the following exchange in
Puckett's EUO:

Q    Okay.   All right.   So in the year 2007, based
upon testimony that I heard from witnesses yesterday,
all these different vendors had either come by and –

A    That's right.

Q    -gotten their – their –

A    Because we were trying – we were trying to get
our inventory down, because I paid over $60,000 in
interest last year on floor plan equipment.   And a
consultant that I hired-they came in and worked with
me last year-told me that I needed to get the stuff
out of there.

A    Okay.

Q    And, of course, I did owe these people some
money, and they were getting some of their stuff out.

Q    Right.

A    But as far as still being a representative of those companies, it is when the bill's paid, then we're gonna go back to being representatives of those companies, just not in as large a scale as we were before.

(Puckett EUO at 37.)

118. Similarly, Federated points to Puckett's EUO testimony shortly thereafter, where he expressly denied that specified suppliers had discussed termination of the dealership with him:

Q    Okay.    Did any of the other vendors, you know, Bush Hog or Cub Cadet or Kioti or McCormick or Taylor Pittsburgh, ever discuss with you terminating –

A    No.

Q    – your dealership?

A    No.    Even when they picked up their equipment. As I stated, when the balance was paid, we will go back, but it won't be as large a scale as we were.    I mean, you know, you're looking at Bush Hog, you would order $150,000 worth of parts – worth of equipment at a time, and that won't happen again.

(Puckett EUO at 46-47.)    Puckett thus clearly led Federated to believe that he was initiating the removal of inventory to control expenses and that Williams Trull would be free to return to selling the vendors' products once any outstanding balance was paid.    Puckett's statements are contrary to the weight of the evidence.    Representatives of Cub Cadet, Bush Hog, and Ferris testified that by the time of the Fire, their respective companies had repossessed their equipment and stopped sending

new equipment to Williams Trull because of its slow payment and sales out of trust (i.e., selling equipment but not timely forwarding proceeds to the supplier or floor plan financer).

119. Carlton Lane Burton ("Burton"), the Cub Cadet representative, testified that following several months of failures by Williams Trull to make timely payments and selling equipment out of trust in 2007, Cub Cadet repossessed all equipment on September 18, 2007. (Burton Dep. at 21.) Burton made clear to Puckett that "the relationship with Cub Cadet was terminated." (Id. at 24.) This included the dealership agreement. (Id. at 25.) Puckett argues that his answer was truthful because his actual agreement was with Textron as dealer representative, not directly with Cub Cadet. This distinction, however, is unpersuasive.

120. Todd Medlin ("Medlin"), a regional sales representative for Briggs and Stratton Yard Power Products, which includes Ferris, testified at trial. He stated that he attended a meeting at Williams Trull in August or early September 2007, along with Puckett and representatives of Textron, a financing company, to address how Williams Trull was going to pay for equipment sold out of trust. (Tr. 4/13/10 at 199-200.) During the meeting, Medlin took an inventory of the manufacturer's equipment on Williams Trull's lot. (Tr. 4/13/10 at 204.) It was explained to Puckett, who was trying to get a

loan to pay the overdue amount (approximately $47,000), that the situation was serious and that failure to pay would result in Williams Trull's inventory being picked up; if that happened, his dealership agreement would be cancelled. (Tr. 4/13/10 at 201.) Puckett never paid, and consequently his inventory was removed and his agreement was cancelled. (Tr. 4/13/10 at 201-02.)

121. Phillip Britt ("Britt"), who represents Bush Hog, testified by deposition. He stated that he audited the Williams Trull account monthly. (Britt Dep. at 11.) At the beginning of 2007, Williams Trull was getting behind in payments, and "as the year progressed to the summer and the volume of business picked up considerably, his SOT [sold out of trust] picked up drastically." (Id. at 11-12.) The dealership was deemed a "high risk dealership," as getting payment from Puckett "got more and more difficult," finally reaching the point of total failure. (Id. at 13-14.) Britt was instructed to remove all Bush Hog inventory from Williams Trull, which he did on September 28, 2007, five days before the Fire. (Id. at 14-15.) Britt testified that he talked to Puckett on that date, told him that the dealership was being terminated, and when Puckett asked if Bush Hog would give him another chance, told him "[o]nce you reach the point that we have to pick up equipment and terminate

your account, that dealership under that current owner will not get another account with Bush Hog." (Id. at 15.)

122. Williams Trull urges that neither Medlin, Burton, nor Britt testified that he was aware that an official termination notice had been provided to Williams Trull as of January 2008. Federated does not dispute this. (Tr. 4/15/10 at 56, 91-94.) Bush Hog provided a written termination notice to Williams Trull on May 23, 2008. (See Ex. 183 ("Bush Hog Dealer Termination"); Tr. 4/15/10 at 90-91.) As of the date of the Fire, and at least as of October 8, 2007, Cub Cadet had not sent a termination letter to Williams Trull. (Ex. 183 (Cub Cadet e-mail).) Eddie was unaware of a letter from any supplier to Williams Trull terminating that supplier's dealership agreement. (Tr. 4/14/10 at 140.) Based on the evidence, however, a termination letter was only a formality.

123. Puckett did admit in his EUO that all dealers "[got] in touch with [him] to ask to retrieve . . . their equipment" "[b]ecause they just have to protect their interest." (Puckett EUO at 47.) Even though formal termination letters had not been sent to Williams Trull prior to the Fire, it is clear that the suppliers had several conversations with Puckett that informed him that his dealership was terminated. Even if Puckett may have held out hope, albeit unrealistic, that he could renew his relationships with his suppliers if he could make it to another

growing season and somehow manage to pay his various suppliers, he clearly denied the *existence* of the discussions about termination in his EUO in an attempt to downplay the severity of his situation. The ability to obtain product from suppliers was critical to the survival of Williams Trull. The court finds that Puckett's denial of termination discussions was false, material and knowingly and willfully made.

### 5. Loans

124. Federated contends that Puckett made material misrepresentations about loans to Williams Trull. These statements relate to the existence of mortgages and loans, balances, and whether such loans were current.

125. At his EUO, Puckett was asked, "Have you taken out any loans on the farm?" He responded, "Sure have . . . about $180,000." He stated that "[t]hose proceeds were part of the settlement to . . . the ex-wife." (Puckett EUO at 24.) Federated argues this was an omission and was misleading for two reasons. First, Robson testified that he found that in addition to the $180,000 loan, Puckett had collateralized a loan from former employee Flinchum and her husband with a security interest in the farm. The Flinchums transferred $78,500 to Williams Trull in March 2005, but by the time of the Fire, the amount had been paid down to $30,862. (Tr. 4/15/10 at 86.) Second, Eddie stated that the $180,000 loan "was also part of

the purchase of Williams Trull, I believe." (Tr. 4/14/10 at 67.)

126. As to the $180,000 loan, the difficulty for Federated is that Puckett's statement was not in response to any particular question. Rather, the sequence was as follows:

Q: When did you take out the loan?

A: In '03.

Q: Is that the year you purchased Williams-Trull?

A: Yes.

Q: Okay. Were those proceeds-

A: No. Those proceeds were part of the - the settlement to the ex-wife.

(Puckett EUO at 24.) Thus, in the absence of a question within which to frame the response, the court cannot find Puckett's answer to be an omission or misleading.

127. Further, Federated's argument of any concealment is meritless. Shortly after Puckett's statement quoted above, Puckett stated, "I paid her [his ex-wife] $100,000 of that [the $180,000 loan]. I've paid Harry Welker [from whom Puckett bought Williams Trull] $80,000 of that. The - what I owed him rest [sic] of business." (Puckett EUO at 26.)

128. Federated further asserts that in this context Puckett misrepresented or omitted the loan the Flinchums provided Williams Trull, which was collateralized by the family farm.

The initial $180,000 loan, which Puckett discussed in the context of his EUO, was obtained in 2003. Flinchum testified that she later made a short-term loan to Williams Trull to cover an outstanding bill but denied that the loan was intended as an investment. (Tr. 4/13/10 at 181-83.) Further, the Flinchums considered entering into a joint venture with Puckett to buy Clapp Brothers, a dealership in Siler City, North Carolina, but they did not intend to invest in Williams Trull. The loan was not initially collateralized by the family farm. Ultimately, the Flinchums decided not to pursue the joint venture and in 2006 drew up a promissory note collateralized by a security interest in the Puckett farm.[18] (Tr. 4/13/10 at 184-85, 190-91.) Puckett fully disclosed the Flinchum loan in his EUO and acknowledged that he currently owed the Flinchums "under $30,000." (Puckett EUO at 132.) This was reasonably accurate within a few hundred dollars.

129. Federated also points to the following: When asked if there were any other loans outstanding for Williams Trull, Puckett told Eddie that "I mean just like um operating loan with Bank of America." (Ex. 78 at FIC0008812.) Robson testified that the answer constituted an omission in that Williams Trull

---

[18] Flinchum left Williams Trull at the end of 2006. She described it as a "stressful environment" and concluded both that she needed more security for the company's debt to her and that "I needed to go." (Tr. 4/13/10 at 188-89.)

also owed First National $182,521, owed the Flinchums $30,862, and had floor plan debt financing of $448,425 outstanding. (Tr. 4/15/10 at 59.) In and of itself, however, the response "just like" implies that the loan with Bank of America was not the only loan in question and that there were others, inviting a follow-up question.

130. Federated points to Eddie's follow-up question that asked if there were any loans outstanding other than the mortgage and the Bank of America loan. Puckett's response began with "[L]et's see[,] I got one with A[,] let's see[,] ARS," a servicing company for Venture Bank, and "I mean it's just a little small[.] I can't even tell you how much that is and that's just drafted out of the account each week." (Ex. 78 at FIC0008812-13.) Robson testified that the loan was actually for $59,000 and had a 121% per annum interest rate under terms that required that payments of $2,500 be swept weekly from Williams Trull's account. (Tr. 4/15/10 at 13.) From the context of this exchange, Puckett's reference to "it's just a little small" could reasonably have been referring to the amount of the drafts, and the court declines to consider this a falsehood.

131. Eddie also asked whether there were any business loans outstanding beside "these three" (i.e., the mortgage, Bank of America, and ARS) to which Puckett responded "No." (Ex. 78 at FIC0008812.) Federated asserts that Puckett omitted Williams

Trull's debt to First National Bank. (Tr. 4/15/10 at 17, 22, 60.) Notably, however, Puckett expressly cautioned Eddie at this point, "I don't have [sic] I'm sorry I can't be accurate, I just don't have any of that stuff here at home with me." (Ex. 78 at FIC0008812.) Therefore, the court will not find Puckett's response to be an intentional misrepresentation.

132. As to floor plan debt financing, it is not clear whether Puckett would have viewed floor plan financing as a "loan" or simply as floor plan financing.[19] Federated's representatives used the terms "loans," "notes," and "floor-plan financing" without consistency in questioning Puckett. In preparing his analysis for Federated, Robson himself distinguished "floor plan debt" from "notes payable other than floor plan." (Tr. 4/15/10 at 100-01.)

133. As to suppliers, Puckett told Eddie in the telephone interview that he had a balance due with Cub Cadet ("like $21,000") and Bush Hog ("like $16,000"). The statement was in reply to a request for "a rough estimate" for the two or three

---

[19] Floor plan financing is often used by companies in Williams Trull's business as a means to procure and pay for new equipment. Basically, "floor-plan financing" is "[a] loan that is secured by merchandise and paid off as the goods are sold." Black's Law Dictionary 707 (9th ed. 2009) (defined under "Financing"). The manufacturer may sell the equipment to a floor plan financing company which in turn sells to the dealer or the financing company "buys the paper." (Tr. 4/13/10 at 196.) When the dealer sells the equipment, the dealer pays the financing company within a reasonable or stated time. If the dealer fails to do so, the equipment is considered to have been sold "out of trust." (Tr. 4/13/10 at 197-98.)

largest supplier balances.  In response to Eddie's question, "Is that current?" with respect to the Cub Cadet balance, Puckett stated, "Yes it is."  In response to the question, "Okay current with that?" with respect to the Bush Hog balance, Puckett stated, "Oh, yeah."  (Ex. 78 at FIC0008812.)  According to Eddie, "Neither were [sic] current.  I think they were basically demanding payment in full because he had sold out of trust. . . . One or more suppliers had huge outstanding balances, I believe."  (Tr. 4/14/10 at 53.)  Under Eddie's view, one could not be current if payment had been demanded in full.  The interview exchange quoted at trial was limited to the two "biggest" balances due suppliers (Ex. 78 at FIC0008812-13), and Robson testified that his investigation disclosed that Williams Trull owed Bush Hog $26,681 and Cub Cadet $49,509 (Tr. 4/15/10 at 77-78).

134. At his EUO, Puckett acknowledged that Williams Trull owed AgriCredit, the finance company for McCormick, stating: "AgriCredit actually owns the McCormick tractors that's sitting on my lot . . . and they send somebody to check them. . . . I owed them for a couple of tractors, and I'm not sure what the exact figure was on that."  Puckett plainly qualified his statement by adding that he was not sure of the exact figures and by indicating the "same thing with Bush Hog and Cub Cadet." (Puckett EUO at 43.)  Puckett also stated that he believed he

70

owed supplier Kioti for one piece of equipment that had been sold, saying "I think that's right." (Id.) Robson testified that his investigation disclosed that Williams Trull owed AgriCredit for four tractors for a total of $159,045 and Kioti was owed $21,347. (Tr. 4/15/10 at 77-78.) With the Bush Hog and Cub Cadet balances, the total owed these suppliers was $256,582. It is not clear from the EUO exchange whether Puckett referenced owing AgriCredit for "a couple of tractors" in total or for a couple of tractors sold and, separately, the tractors remaining on his lot. In any event, Puckett made clear that he did not know the outstanding balances at this point of the EUO, as noted above. The court declines to find that these statements were intentional misrepresentations.

135. Federated asserts that in his EUO Puckett also misrepresented the amount Williams Trull owed Taylor Pittsburgh, a supplier:

Q . . . As of September 30, did you have any balances owing to Taylor Pittsburgh?

A Yes.

Q And do you remember how much that was?

A No, because we had one piece of equipment that was in question because it – they promised to make the customer happy, and they hadn't got out there to do it, yet. So I would say it was probably just a few thousand dollars.

(Puckett EUO at 42.) According to Robson, on October 3, 2007, Williams Trull actually owed $26,899. (Tr. 4/15/10 at 77.)

136. It is not clear that Puckett responded untruthfully to this question in that he acknowledged that a balance was owed but he did not know the amount. By the time of the EUO, he had also given full access to Williams Trull's accountants and provided all the names of the suppliers. His statement of "just a few thousand dollars" was clearly qualified ("probably"), indicating his lack of knowledge to Federated.

137. Federated also points to Puckett's negative response when Eddie asked whether "prior to the fire . . . the business [had] received any notices that a loan or mortgage is being called." (Ex. 78 at FIC0008814.) Eddie testified that "a lot of floor plan companies" were "calling in their notes and demanding payment in full." (Tr. 4/14/10 at 56.) Robson added that Textron correspondence dated September 14, 2007, demanded payment of $136,313 by September 17, 2007, and that GE Commercial Finance ("GE Commercial"), another floor plan financer, demanded payment of $389,974 on July 16, 2007, the full amount of the unpaid balance plus interest, following the failure of Williams Trull to make a past due payment. Collateral had been repossessed as well by floor plan financers. (Ex. 167-FFF; Tr. 4/15/10 at 64-65.)

138. A common understanding of the term "loan" is "[a] thing lent for the borrower's temporary use; esp., a sum of money lent at interest." <u>Black's Law Dictionary</u> 1019 (9th ed. 2009). A common understanding of a "mortgage" is, "[l]oosely, any real-property security transaction, including a deed of trust." <u>Id.</u> at 1102. A "financing agreement" does not fit neatly into either of the two categories that Eddie asked about, and Eddie was free to be more specific. As noted earlier, Federated's own accounting witness, Robson, distinguished floor plan financing from other debt. (Tr. 4/15/10 at 100-01.) Further, the court notes that Puckett had provided Federated the contact information for Williams Trull's dealers. Accordingly, the court concludes that Federated has not demonstrated that these were material misrepresentations.

139. In sum, therefore, the court finds none of Puckett's statements regarding loans to be intentionally misleading.

### 6. Purchases from "Competitors"

140. Federated points to the following exchange in the October 25, 2007 Eddie interview as a material misrepresentation or omission:

> Q    Competitors?  Now what the heck would that mean?
> You haven't bought any product or supplies from a
> competitor?
>
> A    No.

Q    Okay I'm not sure what that question relates to then. . . .

(Ex. 78 at FIC0008814.)  In his EUO, after explaining that the major suppliers had picked up all his equipment, Puckett disclosed how he acquired property for sale by going to a dealer which had the equipment Williams Trull needed for its customers: "If I needed anything, I called the rep, and they told me who had it and . . . would tell me who – which other dealer would have something and we would pick it up."  (Puckett EUO at 41.)

141. Federated asserts that Puckett's EUO response reveals that his prior response to Eddie was misleading.  Given the context of Eddie's question and statements, however, it is apparent that even Eddie was confused as to the meaning of his inquiry, which appears to have stemmed from his parroting a list of questions from a company interview form.  If Eddie was confused, it is hard for Federated to maintain that the context was clear.

142. Federated contends further Puckett knew his response was misleading because selling equipment to Williams Trull for resale "would be a violation of the dealership agreement" and that the manufacturer representatives with whom Robson spoke told him that "they did not permit their dealers to sell to other dealers if that equipment is then going to be resold." (Tr. 4/15/10 at 75.)  While this provision may restrict any

dealer from selling to any other dealer, there is no evidence it is a restriction on the purchaser, such as Williams Trull, and it does not provide sufficient clarity to Eddie's vague question to be the basis of liability.

### 7.  Pending Lawsuits

143. In the October 25, 2007 interview, Eddie asked: "[I]s [sic] there any pending lawsuits against the business or the owners I guess that's yourself?" Puckett replied "No." (Ex. 78 at FIC0008809.)  Federated claims this was inaccurate, noting that at that time a claim and delivery lawsuit by GE Commercial was pending against Williams Trull pursuant to which, on about August 14, 2007, GE Commercial repossessed all its remaining equipment from the Premises.  (Ex. 167-FFF; Ex. 22 at 4; Tr. 4/15/10 at 67.)  When asked during his subsequent EUO if there were any lawsuits against Williams Trull or him in 2007, Puckett responded that, "GE had one [lawsuit] over some equipment that was owed on them . . . and I just turned it over to them, and they dismissed it [the lawsuit]."  (Puckett EUO at 28.)

144. The evidence is insufficient for the court to conclude that at the time of his October 2007 interview Puckett knew that the GE Commercial lawsuit continued after the repossession. Indeed, the lawsuit was a "claim and delivery action," the sole count of which sought only return of the equipment, not damages, while reserving the right to pursue a deficiency action for

monetary damages. (Ex. 167-FFF (Complaint)); see N.C. Gen. Stat. § 1-474 (providing for plaintiff's seizure of property pursuant to an order to do so). The equipment was returned in August, well before the Eddie interview. There is no evidence that GE Commercial indicated to Puckett that further action would be taken in that lawsuit and, in fact, GE Commercial dismissed the action after the equipment was repossessed.

145. Federated appears to view Puckett's statement that the lawsuit was dismissed after the collateral was turned over (which was certainly true as of Puckett's EUO) as a material omission in that Puckett did not disclose that a balance remained after the dismissal. Robson stated without contradiction that $82,425 remained outstanding on the original obligation of $389,974 to GE Commercial. Puckett, however, was not asked at this point about any outstanding balance related to a lawsuit. Therefore, the court finds that Puckett answered the question asked of him and correctly noted in his EUO that the lawsuit had been dismissed.

### 8. Judgments

146. Similarly, Puckett told Eddie "No" when asked if Williams Trull had "any judgments filed against it." Federated cites this as a misrepresentation because, as noted, Robson found that Williams Trull owed GE Commercial $82,425 at the time its lawsuit was dismissed.

147. Federated introduced no evidence that a judgment had been entered against Williams Trull for the deficiency prior to Eddie's interview of Puckett or Puckett's EUO. In fact, a dismissal of the GE Commercial action is inconsistent with a monetary judgment having been entered given the nature of that "claim and delivery" action. Under North Carolina law, a plaintiff may claim the immediate delivery of collateral "at any time before the judgment in the principal action." N.C. Gen. Stat. § 1-472. Equipment is seized under the claim and delivery statute pursuant to an order of seizure. See N.C. Gen. Stat. § 1-474. Eddie conceded at trial he was unfamiliar with the details of a claim and delivery action and was not aware of any "judgments" against Williams Trull. (Tr. 4/14/10 at 110-11.) Thus, there is insufficient evidence to show either an existing judgment against Williams Trull at the time of Puckett's statements or, even if one existed, that Puckett knew of it.

148. Federated also claims that Puckett lied to Webster in the unrecorded interview when Puckett allegedly stated that "[t]here was no one coming after me for money." Federated points to the GE lawsuit, the floor plan companies' repossession of equipment, and a judgment against Puckett obtained by his ex-wife for $25,000. (Tr. 4/15/10 at 54.)

149. With respect to the amount owed to Puckett's ex-wife, it does not matter whether a reasonable layperson would likely

view the judgment as responsive to the question (the lawsuit having been reduced to judgment), because Puckett, in his interview with Eddie a few days later, explicitly disclosed that his "ex-wife filed a judgment for alimony, $25,000 [static] or whatever it is called." (Ex. 78 at FIC0008816.) The related judgment was, in fact, for $25,000 plus attorneys' fees and interest (the latter information apparently being lost in the static on the recording). (Ex. 167-FFF.) Further, in his EUO, Puckett disclosed his divorce and settlement agreement with his ex-wife. (Puckett EUO at 24-27.) Consequently, the court finds that Puckett sufficiently disclosed the existence of the alleged matters to Federated.

### 9. "Bounced" Checks

150. Federated points to the following exchange in Puckett's EUO:

> Q    Were you experiencing some - . . . - bounced checks and things like that in the latter part of the summer; that is July, August, September?
>
> A    Bounced checks of what I've written or what people have written me?
>
> Q    What Williams-Trull wrote.
>
> A    I had a couple that come back.  It wasn't nothing-
>
> Q    Did you miss any payroll during that time period -
>
> A    No.

(Puckett EUO at 90.)  Robson testified that Williams Trull, in fact, had 55 checks during the three month period before the Fire (July, August, September 2007) that were either returned for insufficient funds or paid as overdrawn.[20]  (See Tr. 4/15/10 at 10-12.)

151. A reasonable insured may not interpret checks paid by the bank which result in the account being overdrawn, essentially treated as overdrafts, as "bounced checks."  Indeed, overdraft protection, if that was the cause of the bank's payments, exists to avoid bounced checks.  In response to the court's inquiry, Robson stated that 23 checks were returned for insufficient funds during the relevant period.  (Tr. 4/15/10 at 85, 110-12.)  However, the statement that "a couple that come back" is problematic when, in fact, there were 23 instances of checks returned for insufficient funds.  How many of these 23 instances involved different "checks" is not known, and Robson conceded at trial that a single check could have been processed more than once if someone requested that it be resubmitted. Robson did not review deposit slips and checks but made calculations from Williams Trull's monthly statements.  Robson admitted the possibility of a check "bouncing a couple of

---

[20]  Though the question narrowed the time frame to July-September 2007, during October 1 to 3, 2007, the three days before the Fire, an additional 26 company checks were returned for insufficient funds or paid as overdrawn.  (See Ex. 150.)

times," which possibility had not been taken into account in his review.  (See Tr. 4/15/10 at 110-12.)

152. While it is not clear precisely how many checks "bounced," it is clear that the problem was substantial.  And while Puckett acknowledged that "a couple" of checks bounced, he purposefully downplayed the severity of the problem by volunteering, "It wasn't nothing."  As a result, Federated's counsel moved on to a new topic.  Though Puckett had already made his accountants and records available to Federated, the court finds that his answer was an intentional effort to steer the inquiry elsewhere, and thus an intentional material misrepresentation.

### 10.  Puckett's Statements Regarding Knowledge of Williamson, Sports, and the Setting of the Fire

153. The final category of alleged material misrepresentations or omissions relates to the Fire itself.  In the Eddie interview, the following exchange occurred:

Q   Um huh.  Um, do you know if anyone associated with the business, employees um or yourself has ever met or knows of those two suspects?

A   No I never seen those two guys until the Fire Marshall [sic] showed me their pictures when I was in his office.

(Ex. 78 at FIC0008822.)  At his EUO, the following exchange took place:

Q   Okay.  But did you have any involvement in either hiring or procuring-

80

A       No, sir.

Q       – these persons to burn that –

A       This is – this is my livelihood.  Why – I mean, I
        – this is where it's gotten me, the whole
        process.  I quit a job with security, insurance,
        benefits, the whole nine yards, and I never had
        to worry about anything, to run this business,
        and this is the only livelihood I have.  And I –
        why would I do anything to take that away from
        myself?

Q       So your answer is no?

A       No.

(Puckett EUO at 162.)  Puckett also testified that he had "no

idea" who Williamson and Sports were and that he had "[n]ever

seen them before in my life."  (<u>Id.</u> at 160-61.)  He also stated

that he had no personal knowledge of anyone's discussions or

thoughts about having the Premises burned and denied having used

a third party to negotiate with the "guys who came in there"

(i.e., Williamson and Sports).  (<u>Id.</u> at 162.)

    154. Federated contends that Puckett's answers were

misleading and false, citing its evidence relating to the arson

for hire defense, including Puckett's cell phone records.  (Tr.

4/14/10 at 57.)

    155. Whether Puckett's statements constitute a

misrepresentation of a material fact depends to a large extent

on this court's determination whether he was involved in setting

the Fire.  Similarly, whether Williams Trull, through Puckett,

was responsible for the setting of the Fire depends in large part on the court's admission of Williamson's alleged statements, which is addressed _infra_ in the Conclusions of Law. Accordingly, whether Puckett's statements denying involvement in the Fire are misrepresentations will be addressed in the Conclusions of Law.

### G.   Federated's Investigation

156. The Fire was unquestionably intentionally set. Williams Trull, through Puckett, filed proofs of loss seeking payment for the Fire, pursuant to the Insurance Contract.   In light of the initial information regarding law enforcement's investigation, the nature of the Fire, the arsonists, and the financial status of Williams Trull, Federated conducted its own investigation.

157. Potential fraud cases require investigation because fraud is often not only deceptive but also secretive with respect to who might be involved.  (Tr. 4/14/10 at 39.)

158. In cases of commercial fire loss, important investigative factors include the financial condition of the business involved and any connection of the arsonist to the insured.   While it is not unusual for an insured to require money to re-open a business after a fire (Tr. 4/14/10 at 95), an early request for advance payments may indicate financial difficulty (Tr. 4/14/10 at 44-45).

159. At trial, Federated presented testimony that it had difficulty obtaining copies of the November 2007 confession statements made by Williamson and Sports. (Tr. 4/14/10 at 60, 88.) The January 30, 2009 report of Federated's private investigator, however, states that it obtained a copy of Williamson's confession statement on November 13, 2007, although it did not receive Sports' confession until January 29, 2009. (Ex. 168.)

160. Eddie testified that no decision had been made regarding the claim when Federated retained outside counsel. Eddie also testified that in the majority of fire cases for which outside counsel is retained, litigation does not ensue. (Tr. 4/16/10 at 73-77.)

161. The investigation by Federated consumed significant time and resources to determine the financial condition of Williams Trull in addition to investigating the Fire. In light of all the circumstances, including those noted above, the court finds that Federated's actions were reasonable.

## H. Proofs of Loss and Federated's Responses to Williams Trull's Requests for Documents

162. Federated was notified of the Fire on October 4, 2007. The insurer provided proof of loss forms to Williams Trull by hand delivery on October 19, 2007, within fifteen days of receiving notice of the Fire. (Tr. 4/13/10 at 222; Ex. 198 at

WT676-78.) This occurred on the same day Puckett authorized Federated to obtain credit and financial information about him and Williams Trull, and the date of the first advance payment from Federated.

163. Williams Trull submitted three proofs of loss. The first proof of loss was dated October 25, 2007, the same day as Puckett's recorded interview with Eddie. (Tr. 4/15/10 at 134; Exs. 2, 198 at FIC0000998, 202.) Federated rejected this proof of loss in a November 2, 2007, response because it did not contain a claim under the policy with supporting documentation. Federated also noted that it continued to investigate the Fire "under a complete reservation of rights" and encouraged Williams Trull to submit a completed proof of loss. (Tr. 4/13/10 at 222-24; see Exs. 2, 198 at WT694-95.) The response was within thirty days of the submission of the first proof of loss and clearly stated Federated's intention, that is, to reject the claim as filed but to permit Williams Trull to submit a proof of loss without the deficiencies of the first proof of loss.

164. Williams Trull's second proof of loss, dated December 9, 2007, was also incomplete. (Ex. 167-BBB (December 9, 2007 fax containing what appears to be the first proof of loss which was treated as a second proof of loss).) Federated responded on December 13, 2007, noting that this proof of loss was identical to the first, with none of the

deficiencies corrected. As in the earlier response, Federated stated that it again rejected the proof of loss "at this time" and unilaterally extended the submission deadline. Federated warned that it was "imperative" that Williams Trull provide the requested information on the proof of loss form in advance of the EUOs scheduled for January 9-10, 2008. (Ex. 198 at WT925-256) Federated allowed Williams Trull additional time to complete the proof of loss subject only to a deadline to submit the proof of loss prior to the scheduled EUOs. (Tr. 4/14/10 at 62.) Federated's response was within thirty days of the second proof of loss and clearly stated Federated's intention, that is, to reject the claim as filed but to permit Williams Trull to submit a proof of loss without the deficiencies of the first proof of loss.

165. Williams Trull failed to complete the business income loss section in either of the first two proofs of loss. (Tr. 4/14/10 at 116; see Exs. 2, 167-BBB, 198 at WT694-95 & WT925-26.)

166. In December 2007, Puckett contacted Costello for guidance in completing the proof of loss form. Costello responded by letter dated December 17, 2007, in which he told Puckett that to calculate loss of business income he should "use [his] experience with [his] business earnings to determine [his]

loss." (Ex. 65.) "Business earnings" are not defined in the Insurance Contract. (<u>See</u> Tr. 4/13/10 at 237.)

167. Williams Trull's third proof of loss, dated January 4, 2008, claimed business loss in the amount of $1.1 million and total loss of over $1.7 million. (Tr. 4/14/10 at 89; Exs. 3, 198 at FIC000999-1000.) Federated argues that this grossly overstated Williams Trull's lost income, which it contends should be limited to net income. More precisely, Federated claims that Williams Trull was insolvent and that this claim was a fraudulent misrepresentation. Puckett explained at his EUO that he derived his lost income claim from the projections of the business' total (gross) income that had been prepared by Price, his business consultant, in a 2007 forecast. (Puckett EUO at 191; <u>see</u> Ex. 159.) This appears to be the case, based on the evidence. (Price's forecast estimated Williams Trull to have annual sales in 2007 of $2,009,555, which was up from 2005 sales of $1,837,270, and 2006 sales of $1,836,872. (Ex. 159 (forecast for 2007); Ex. 125 (2005 and 2006 figures).)

168. On January 16, 2008, Federated, through counsel, informed Williams Trull that the third proof of loss was "neither accepted nor rejected at this time, pending the completion of the investigation and evaluation of this claim." At that time requests for documents by Federated to Williams Trull remained outstanding. (Ex. 83.)

169. Federated informed Puckett that it believed his approach of calculating lost income was improper, and Williams Trull revised its lost business income claim downward, to $486,301.28 in a January 22, 2008 revision. (Ex. 87.) Puckett also asked Federated to contact him if it had any questions about the revised figure, but there is no evidence Federated ever did so, even though Robson noted in a report that it appeared that Puckett and his accountants listed accounts payable and payroll rather than calculating lost business income. (See Tr. 4/13/10 at 260-61; 4/15/10 at 154.)

170. Puckett's actions were consistent with an October 8, 2007, email Robson had sent to Puckett and Jill Tate, one of Williams Trull's accountants, wherein Robson informed them that he had been hired to "calculate Williams Trull Co.'s loss of business income and extra expense arising from" the Fire. (Ex. 32.) Robson followed this with a letter the next day to Costello, confirming that Robson's firm had been engaged "to calculate the insured's business income loss and extra expense due to the Fire." (Ex. 198.)

171. The court finds that Puckett's statement of lost profits was not an intentional material misrepresentation. Though hopelessly optimistic, it was consistent with the projections, albeit outdated, provided by his consultant, and Puckett revised it downward substantially shortly after it was

submitted. Federated provided no guidance on how to calculate the amount but led Puckett to believe that Robson would do so. Puckett's response resulted from this confusion, and the court concludes it was not an intended misrepresentation.

172. Williams Trull also complains of the timing of Federated's responses to its requests for documents, including its request for a copy of the Insurance Contract.

173. The court finds that Federated responded in a reasonable manner with respect to these requests. For example, in December 2007 Federated timely forwarded the transcript of Puckett's October 25, 2007 interview with Eddie and informed Puckett that a copy of the Insurance Contract he requested would be forwarded to Puckett's attention. At that time no examinations under oath or depositions had been taken and, as a result, no related transcripts existed. (See Ex. 198 at FIC0008746.) By the time of his EUO a few weeks later, Puckett had a copy of the Insurance Contract. (Puckett EUO at 191-92.) Federated forwarded transcripts of the EUOs taken in early January 2008 to Williams Trull's attorney on January 30, 2008. (See Ex. 92.)

174. The following section supplements these Findings of Fact and, to the extent statements therein constitute findings of fact, are incorporated herein.

## II. CONCLUSIONS OF LAW

1.   The matter in controversy exceeds $75,000, exclusive of interest and costs, and the court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

2.   Venue is proper pursuant to 28 U.S.C. § 1391(a) because the action is brought in the district in which Williams Trull does business and in which a substantial part of the alleged events or omissions giving rise to the action occurred.

### A.   Complaint Count I: Intentional Burning of Premises

3.   North Carolina law, which governs this claim, recognizes intentional burning as a defense to an insurance claim.  Shelby Mut. Ins. Co. v. Dual State Constr. Co., 75 N.C. App. 330, 332, 330 S.E.2d 508, 510 (1985).  Federated bears the burden of proving by a preponderance of the evidence that "the property was intentionally burned and that the insured participated directly or indirectly in its burning."  Id.; see Freeman v. St. Paul Fire & Marine Ins. Co., 72 N.C. App. 292, 298, 324 S.E.2d 307, 310 (1985).  Federated also bears the burden of proving by a preponderance of the evidence that Puckett was acting as owner on behalf of Williams Trull and on Williams Trull's behalf in such participation.  The "evidence must show that the more reasonable probability is that the fire

was caused by the [insured] or an instrumentality solely within their control." Freeman, 72 N.C. App. at 298, 324 S.E.2d at 310 (citations omitted). The insured's "motive and opportunity are merely circumstances to be considered in determining whether there has been an intentional burning by the insured or someone procured by him." Id. at 299, 324 S.E.2d at 311. Circumstantial evidence "can be sufficient to prove an intentional burning." Id. at 297, 324 S.E.2d at 310.

4. The parties agree that the Premises were intentionally burned. Thus, the dispositive question with respect to Count I is whether Williams Trull "participated directly or indirectly" in the Fire. Freeman, 72 N.C. App. at 298, 324 S.E.2d at 310.

5. A significant portion of Federated's evidence implicating Puckett, and thus Williams Trull, involves statements allegedly made by Williamson. Williamson's alleged statements are inadmissible hearsay under Federal Rule of Evidence 802 unless they fit an exception. While these statements may be admissible on other claims before the court for reasons other than the truth of their assertions (e.g., for determination of the reasonableness of Federated's actions in assessing Puckett's claim), Federated intends to rely upon them on the intentional burning claim for their alleged truth. Federated argues they are admissible against Williams Trull as

statements against penal interest under Federal Rule of Evidence 804(b)(3).

6. Where the declarant is unavailable, Federal Rule of Evidence 804(b)(3) in effect at the time of the trial excepts from the hearsay prohibition statements that are against his penal interest, that is:

> statement[s] which . . . at the time of [their] making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement[s] unless believing [them] to be true.

Fed. R. Evid. 804(b)(3).[21]  Williamson is clearly unavailable, because he is deceased.  Thus, the question is whether and, if so, which of Williamson's alleged statements are against his penal interest.

7. "The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances."  <u>Williamson v. United States</u>, 512 U.S. 594, 603-04 (1994); <u>see also</u> <u>United States v. Jordan</u>, 509 F.3d 191, 202 (4th Cir. 2007).  Thus, each statement must be viewed in context.  <u>Williamson</u>, 512 U.S. at 603.  Statements

---

[21]  Amendments to Rule 804(b)(3) effective December 1, 2010, do not alter the substance of this portion of the rule.

that may be neutral on their face or provide significant details about the crime may, depending on the situation, be self-inculpatory if they link the declarant to the crime. Id.

8. Rule 804(b)(3), however, "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." Id. at 600-01. Thus, where inculpatory statements are mixed with other statements (whether neutral or self-exculpatory), the district court must engage in a "fact-intensive inquiry, which would require careful examination of all the circumstances surrounding the criminal activity." Id. at 604. The Supreme Court has cautioned:

> The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else. [T]he arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.

Id. at 601 (citations omitted). If a reasonable person in the declarant's position might think that implicating another would decrease his exposure to criminal liability (at least so far as sentencing goes, under the theory that "[s]mall fish in a big conspiracy often get shorter sentences than people who are

running the whole show"), the statement may be more self-exculpatory than inculpatory. Id. at 604.

9. Rule 804(b)(3) "places a formidable burden on those seeking to offer evidence pursuant to that rule." United States v. Blake, 571 F.3d 331, 350 (4th Cir. 2009) (internal quotation marks omitted), cert. denied, 130 S. Ct. 1104 (2010). However, the burden is not insurmountable. For example, in Jordan, 509 F.3d at 202-03, the court found no abuse of discretion in admitting under Rule 804(b)(3) statements as to the declarant's participation in a conspiracy involving the defendant luring a drug dealer to an apartment, robbing him, and luring another person to the apartment. The court noted that "although [the declarant's] statements to Adams inculpated [the defendant], they also subjected *her* to criminal liability for a drug conspiracy and, by extension, for Tabon's murder." Id. at 203 (emphasis in original). It was also noteworthy that the statements were made to a friend to relieve guilt and not to law enforcement in an effort to minimize culpability or criminal exposure. Id.; see also United States v. Udeozor, 515 F.3d 260, 267-68 (4th Cir. 2008) (in case charging conspiracy to hold another in involuntary servitude and harboring a juvenile alien, finding no abuse of discretion in admitting against the wife the recorded telephone conversations between her and her unavailable husband which contained his admissions that he smuggled the

victim into the country, hit the victim, inquired whether the victim asked if police were looking for him, and had sexual intercourse with a minor).

10. Statements made by a declarant that implicate another have also been found to be admissible where they sufficiently inculpate the declarant. Closely on point is <u>United States v. Manfre</u>, 368 F.3d 832 (8th Cir. 2004). There, the government charged the defendant, Manfre, with various crimes arising from the arson burning of his failing nightclub. The government charged that the defendant hired his 21 year-old bouncer, David Rush, to burn the club. Rush died before trial. The trial court admitted under Rule 804(b)(3) the statements of Jessica Van Gaalen, Rush's fiancée and mother of his child, who testified that as she observed Rush reviewing blueprints of the nightclub in question, he told her he was going to burn it down with the defendant. The trial court also admitted the testimony of the defendant's friend, Trevor Mills, who testified that Rush had told him that the defendant had hired him to burn down the nightclub as part of an insurance scam. Rush also told Mills of the plan to use gasoline in the fire, his possession of the blueprints, and the eventual plan to split the proceeds. Rush sought out these conversations with Mr. Mills, hoping to obtain guidance on whether to go through with the plan. <u>Id.</u> at 840-43. The court of appeals affirmed the admission of these statements

as against Rush's penal interest and because they were not made in a setting where he had a major incentive to shift blame to the defendant.  Id. at 843.

11.  In PECO Energy Co. v. Boden, 64 F.3d 852 (3d Cir. 1995), the trial court similarly admitted hearsay statements showing that an unavailable declarant engaged in a plan to defraud an insurance company.  There, the insured, PECO Energy Company, sued to recover for a series of thefts of fuel oil. The trial court admitted the testimony of a PECO investigator, who stated that one of PECO's independent fuel oil delivery drivers, Bill Joyce, told him that the delivery company's owner (Danny Jackson) had instructed Joyce "to steal on approximately 75% of the deliveries" and "to steal for between three and five minutes."  Id. at 859.  On appeal, the Third Circuit held that the district court did not abuse its discretion in admitting the statements under Rule 804(b)(3).  In doing so, the court of appeals explained that "[a] person's admission that he stole for someone else is as much against his interest as an admission that he stole for himself.  It subjects him to possible criminal responsibility and civil liability."  Id.; see also United States v. Holmes, 30 F. App'x 302, 308 (4th Cir. 2002) (per curiam) (unpublished opinion) (finding no abuse of discretion in admitting under Rule 804(b)(3) the jailhouse confession of a non-testifying codefendant that he had a "partner" in the

95

charged robbery);[22] <u>United States v. Hamilton</u>, 19 F.3d 350, 357 (7th Cir. 1994) (holding (in pre-<u>Williamson</u> case) that a non-testifying codefendant's statement to his cellmate, with whom he was on friendly terms, that he and the defendant robbed the bank fell within Rule 804(b)(3)).

12. Williams Trull argues that the Supreme Court has consistently viewed an accomplice's statements "that shift or spread the blame to a criminal defendant as falling outside the realm of those 'hearsay exception[s] [that are] so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability,'" quoting <u>Lilly v. Virginia</u>, 527 U.S. 116, 133 (1999). It is true that <u>Lilly</u> stated that "a confession by an accomplice which incriminates a criminal defendant . . . does not come within a firmly rooted hearsay exception." <u>Id.</u> at 134 n.5 (citation omitted) (quotation marks omitted). However, <u>Lilly</u> was only a plurality opinion, and the challenge in the case was rooted in the constitutional limitations of the Confrontation Clause of the Sixth Amendment. In the present civil case, the Confrontation Clause is not implicated. Moreover, several of the cases cited above have allowed, post-<u>Lilly</u>, incriminating confessions of accomplices that implicate another. Thus, the court declines to accept

---

[22] Unpublished cases lack precedential authority and are cited herein only for their persuasive reasoning based on analogous facts.

Williams Trull's argument that all of Williamson's alleged statements implicating Puckett are per se inadmissible on hearsay grounds.

13. Though "corroborating circumstances" are not a prerequisite for admission in the civil context under current Fourth Circuit case law,[23] the court in this action has considered several factors in determining the admissibility of such statements: whether the declarant had pleaded guilty at the time of the statement or was still exposed to prosecution; whether he had a motive to lie or curry favor; whether he repeated the statement, and if so, consistently; the parties to whom the statements were made; the relation of the declarant to the accused; and the nature and strength of independent evidence relevant to the conduct in question. Cf. United States v. Bumpass, 60 F.3d 1099, 1102 (4th Cir. 1995) (listing factors).

---

[23] Federal Rule of Evidence 804(b)(3), at the time of trial, read as quoted in the text above. The only reference to "corroborating circumstances" was in the last sentence of Rule 804(b)(3), which provided that "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." The Fourth Circuit limited the requirement of "corroborating circumstances" to the statutory language. See Jordan, 509 F.3d at 202 n.6. On its face, this language applies to criminal cases only (i.e., only when offered to "exculpate the accused"). Under current Rule 804(b)(3), the "corroborating circumstances" requirement applies only when the statement "is offered in a criminal case as one that tends to expose the declarant to criminal liability." The Advisory Committee Notes to amendments to Rule 804(b)(3) effective December 1, 2010, note that the amendment "does not address the use of the corroborating circumstances for declarations against penal interest offered in civil cases." Fed. R. Evid. 804(b)(3) advisory committee note.

14. In considering these factors in the present case, it appears that Williamson had not pleaded guilty at the time of his alleged statements and was still exposed to criminal liability. By the time of his confession, he had been caught in the act of arson and certainly had some motive to pin the blame on a "bigger fish" in the hopes of minimizing his punishment. However, the evidence is that he had made several self-inculpatory statements before his confession that implicated not only himself but Puckett and thus Williams Trull. Whenever Williamson allegedly made the statements, whether before or after his confession, he exposed himself to further criminal liability (beyond arson or burning) for conspiracy not only with respect to the burning but potentially with respect to an attempt to commit insurance fraud or obtain money by false pretenses. See N.C. Gen. Stat. §§ 14-2.4 ("Punishment for conspiracy to commit a felony"), 14-62 ("Burning of certain buildings"), 14-100 ("Obtaining property by false pretenses"), 58-2-161 ("False statement to procure or deny benefit of insurance policy or certificate"); State v. Langley, 64 N.C. App. 674, 308 S.E.2d 445 (1983) (no error in case in which defendant was convicted of conspiring to burn and burning of a building used in trade or business); State v. Aleem, 49 N.C. App. 359, 271 S.E.2d 575 (1980) (no error in case in which defendant was convicted of conspiring to present fraudulent

insurance claim). Moreover, the evidence indicates that Williamson repeated the statements implicating Puckett on several occasions to various people, including not just law enforcement, but more frequently to friends and family members, including his mother and the mother of his children. Independent evidence also supports an arson for hire scenario. In fact, it is the only scenario that is plausible on the facts of this case, as it is highly unlikely that Williamson would have been motivated to set the Fire merely because he was high on drugs and alcohol. Indeed, Williams Trull does not even argue this, but rather points the finger of blame at Saferight as having hired Williamson. Evidence of the last factor – Williamson's relationship to Puckett – is present but limited. However, there is substantial evidence that Williamson had a close relationship with Saferight, who of course worked for Puckett.

15. Considering all the above as to the intentional burning claim, the court admits the following evidence of Williamson's alleged statements as against Williamson's penal interest under Rule 804(b)(3):

a. <u>Williamson's confession</u>. Most of this confession, starting with the sentence "The first part of October . . ." through the end of the confession, with the exception of the sentence "He told me to take the cash drawer,"

inculpates Williamson and is admissible under Rule 804(b)(3). In addition, and except for the first two sentences, the balance of the confession inculpates Williamson in criminal conduct, as described above. (The first two sentences arguably inculpate Williamson but are not necessary to the court's conclusions herein.) The confession was given to law enforcement. At the time of this confession, however, Williamson had not pleaded guilty and was not in custody (but had been released on bail). On the other hand, he had been caught red-handed and did have a motive to curry favor with law enforcement. The confession was largely consistent with other alleged statements made by Williamson that implicate himself in arson for hire with Puckett. Therefore, the court admits all of Williamson's confession, except for the three sentences noted, under Rule 804(b)(3).

b. <u>Sports' Confession</u>. Sports authenticated his confession at trial. It contains less hearsay attributable to Williamson. The court finds that of the statements attributable to Williamson, the following are admissible under Rule 804(b)(3) as inculpatory of Williamson: "David asked me if I wanted to make some money," "David said $10,000.00 split even," "some guy wanted to pay us to burn down his business" and "said that one" (referring to the Premises), "[H]e told me to go under the third section of the fence," "David told me to go back outside and get

a gas can on the left side of the door," and "where [David] said it would be." Further the balance of the confession, which Sports reiterated at trial, does not contain hearsay and is admissible.

c. <u>Brenda Williamson</u>. The court admits her testimony as noted in paragraph 34 that after the Fire Williamson told her he had burned the Premises for money.

d. <u>Paton</u>. The court admits Paton's testimony that Williamson called her from jail and stated that he and his nephew burned down the building. In addition, the court admits the remainder of her testimony as noted in paragraphs 35 and 42 because it implicates Williamson (as well as Puckett) in arson for hire. The court admits as against Williamson's penal interest Paton's testimony as noted in paragraphs 45 and 46 that Williamson asked Paton to find Puckett's telephone number because he did not like "having to go through Bobby" to contact Puckett and "wanted to get in touch with Billy himself."

e. <u>Stickle</u>. The court admits Stickle's testimony noted in paragraph 37 to the extent that she claims that Williamson confided in her before the Fire that he had an agreement to burn a business for money, but not as to the naming of Puckett at that time (because the court finds, when considering her testimony in context, that she likely learned Puckett's name as the business owner after the fact). Her

testimony as to the map she claims Williamson showed her is not hearsay, but Williamson's alleged statement as to an "x" indicating where the entrance door was located is admitted as well as against his penal interest. Similarly, the court admits Stickle's testimony that she overheard Williamson tell her mother that he was offered money to burn down a building. The court also admits her testimony in paragraph 42.

f. <u>Hazelwood</u>. The court admits her testimony as noted in paragraphs 36, 42, and 47, including her statement that she was present once when Williamson called Saferight and told him to call Puckett to find out where his money was for setting the Fire.[24]

g. <u>Davis</u>. The court admits Davis' testimony as to what Williamson allegedly told him, as noted in paragraphs 39, 42, 48, and 56. As noted earlier, however, except for Davis' statement that Williamson and Saferight were friends, the court does not rely on Davis' testimony, finding Davis' recollection to be unreliable because of his drug and alcohol consumption at the time he claims Williamson made the statements.

---

[24] Federated argues, and the court finds, that this statement is also admissible as a statement of a co-conspirator under Federal Rule of Evidence 801(d)(2)(E) because it was made during the course of and in furtherance of a conspiracy to burn the Premises insofar as Williamson's attempts to collect the proceeds from an arson for hire would, until paid, be part of the continuing conspiracy. <u>Cf.</u> <u>United States v. Neal</u>, 78 F.3d 901, 905 (4th Cir. 1996) (upholding statements of co-conspirator as furthering conspiracy when made to avoid detection and apprehension by law enforcement, even though they did not directly further the cause of the drug deal).

16.  The court finds that Williams Trull, a corporation, acted primarily through and was controlled by Puckett, its sole owner and chief officer.  The acts of Puckett relating to Williams Trull, therefore, are the acts of the insured, Williams Trull.  See Dual State Constr., 75 N.C. App. at 333, 330 S.E.2d at 510 (individual whose conduct at issue was president and sole shareholder of defendant corporation).  The court further finds that, certainly as a result of information provided by his consultant Price and his accountants as well as his own observation, Puckett was aware that the business was in distress and that his ability to continue operations had deteriorated due, in large part, to suppliers' and financing companies' repossession of product, a dramatic decrease in the company's ability to obtain new product for sale, and the company's mounting debts.  Puckett, and therefore Williams Trull, had sufficient motive to commit arson for hire.

17.  The court has carefully considered the evidence and arguments advanced by Williams Trull in defense against Federated's claim.  Williams Trull's most persuasive arguments relate to the presence of the dog and BMW.  Williams Trull argues that it is unlikely that he would have intentionally left the dog in danger had he been aware of the impending Fire.  It appears that Puckett had some affection for Cougar, and the court assumes that he would not have burned the Premises in a

manner intending to injure the dog.  Yet there are several potential, reasonable explanations for what occurred.  For example, sufficient time had passed since Puckett's alleged conversation with Williamson earlier in September 2007 to have led Puckett to believe that Williamson may have gotten cold feet.  Alternatively, there is at least an inconsistency between Williams Trull's heavy reliance on a bond between Puckett and the dog, on the one hand, and the lack of any evidence that Puckett expressed any concern for the dog's presence to the fire department upon first being called about the Fire (when time was of the essence), on the other hand.  This suggests that Puckett had some basis (e.g., a prior discussion with Williamson) for believing that a plan existed for the dog's well-being during the Fire (to let it outside), but that Puckett's concern was naturally piqued when he did not see the dog on the scene.[25]  Of course, it would have taken little foresight for Puckett to have realized that removing the dog from the Premises on the night of the Fire would likely raise suspicion.

18.  The presence of the BMW is a less difficult question. The BMW was covered by insurance that would have made Puckett whole.  Moreover, Puckett drove a truck in addition to the BMW

---

[25]  Interestingly, Puckett testified in his deposition that he returned to the Premises at 8:30 p.m. that evening "to let the dog out." (Puckett EUO at 172-73.)  He did not mention this at trial.  The parties did not formally designate this portion of the transcript, and the court therefore does not rely on it.

and, like the dog, it presented Puckett with a dilemma: removing the BMW from inside the shop (where he normally kept it) on the one night a Fire occurs and when he had already driven his other vehicle home would have been difficult to explain.

19.  Ordinarily, efforts to operate a business after a fire could tend to negate an inference of arson involvement.  Puckett contends that he sought to return Williams Trull to operation as quickly as possible.  However, once Williamson and Sports were caught, Puckett's hand was forced because failure to try to reopen the business may have raised suspicions over his intentions and his involvement in the Fire.  Moreover, given that all suppliers' inventory had been repossessed, there was little business to conduct other than repair work.

20.  Though all statements of Puckett's alleged involvement in the Fire originated from one source – Williamson - the basic story remained consistent with each witness.  It is also important that many of Williamson's statements were made to family members and others who were not in law enforcement and whom Williamson had little incentive to mislead.  Williams Trull argues that the family members and friends were so driven by remorse for their part in contributing to Williamson's death that, to alleviate their guilt, they arrived (through their common discussions that counsel says became "folklore") at a scenario that blamed Puckett.  Williams Trull also suggests that

the testimony of the witnesses "morphed" from the time they were first interviewed until their final testimony. That is, from a version that Puckett procured Williamson directly to a scenario where Puckett used Saferight as an intermediary. Neither argument satisfactorily undermines the witnesses' rendition of what they recalled. Further, the inconsistencies Williams Trull identifies relate largely to the alleged unsworn responses of certain witnesses to the inquiry of Federated's agents; yet, the witnesses' *sworn, admissible* testimony remained relatively consistent. Moreover, by the time of the September 29, 2009, depositions of Williamson's friend (Davis), Williamson's mother (Brenda Williamson), and Williamson's girlfriend (Hazelwood), Williamson was long deceased and Sports appears to have already pleaded guilty to a drug possession charge (with the arson charge dismissed). (See Doc. 112 (referencing depositions); Ex. 7 (Williamson's death certificate); Tr. 4/12/10 at 121-22, 162, 167 (indicating Sports' guilty plea was a significant time prior to trial).) Thus, family members and friends had even less incentive to "help" either Williamson or Sports avoid criminal exposure by testifying falsely.

21. There are discrepancies between the confessions of Williamson and Sports. Most notably, Sports stated that Williamson told him the payment for setting the Fire would be $10,000 "split even," five times greater than the amount

Williamson's confession states that Puckett allegedly offered. One might reasonably expect Williamson to have stated that he would be paid the larger amount. And Williamson's statement in his confession (that Officer Austin wrote out) that Puckett offered $2,000 also differs from the amounts testified to by friends and family members. In addition, Williamson's confession states that he first advised Sports of the arson opportunity "a couple of nights before" the Fire, while Sports claims to have been told of it while sitting at the bar in Reidsville shortly before the Fire. The court concludes that these discrepancies more likely resulted from errors of recollection than intent. Importantly, these differences would tend to cast doubt, if any, on the nature and timing of an arrangement rather than on its existence. Here, neither party contests the fact that Williamson recruited Sports to help set the Fire and that both believed they would be paid by someone else to do so.

22. Williams Trull also points to Williamson's claim to have known about the sale of the BMW as evidence that the confession is unreliable or was a product of Saferight's doing. Even though Williamson claimed to have first talked with Puckett "the [f]irst of September" and "three or four days later," reference to the sale of Puckett's BMW in the confession simply reflects that Williamson learned about the BMW purchaser either

the day of the Fire or later. Its inclusion does not render the confession unreliable per se. In fact, because that information was known to those working at Williams Trull, it suggests strongly that Williamson had a source of information at the company, with Saferight and Puckett being likely candidates.

23. Williams Trull suggests that a logical inference is that Saferight contracted with Williamson to set the Fire to collect insurance proceeds on what became Saferight's $20,000 tool claim. (See Tr. 4/12/10 at 49; Tr. 4/16/10 at 159-60.) Because Saferight did not testify live at trial, the court is left with the cold record of his sworn testimony during his EUO and deposition. Even on these transcripts, it is plain that he was evasive and untruthful. Saferight clearly tried to conceal his friendship with Williamson, denying they were even "friends." (Saferight Dep. at 70-71 ("[n]ot even really friends").) In addition to the evidence of the close social relationship they shared, Williamson visited Williams Trull sometime before the Fire and spoke with Saferight. (Id. at 28.) Given their relationship and the amount of time they spent together, it is hard to believe, as Saferight claimed, that it was not until after Williamson's death that he became aware that Williamson had been arrested for burning the Williams Trull business. (Id. at 65.) When pressed on this, Saferight allowed that he "may have" heard the names of the two suspects after the

Fire, but he "didn't really pay no mind to it." (Id. at 88.)
This is simply unbelievable given the evidence that Saferight
helped bail Williamson out of jail.

24. Williams Trull contends that the court should invoke
the principle of Occam's razor, attributable to the 14th century
logician William of Occam: that the simplest of competing
theories should be preferred to the more complex. See L.W.
Matteson, Inc. v. United States, 61 Fed. Cl. 296, 310 & n.10
(Fed. Cl. 2004). The simplest theory, Williams Trull argues, is
that Williamson simply burned the business. However, that
Williamson decided to travel from Greensboro to Reidsville to
burn the business for no apparent reason and only because he was
drunk and/or high on cocaine is unlikely, given the evidence.
There is no evidence of motive; theft was ruled out. It is also
inconsistent with the evidence that Williamson prepared in
advance to burn the building, including procuring latex gloves.

25. Thus, the question is: on whose behalf was Williamson
(and thus Sports) acting? The evidence admits of three logical
options: Puckett, Saferight, or some third party.[26] The record

---

[26] Neither party suggests that Puckett's father was involved, but his
testimony is not entirely credible. While Lewis Puckett suffered a
stroke previously, his denials about having had any discussions with
his son about Williams Trull's financial condition, vanishing
inventory, or the Fire are difficult to accept. (See, e.g., Lewis
Puckett Dep. at 44-46, 76 ("we had no reason to discuss it [the
Fire]"), 77-79.) In fact, these denials are inconsistent with the
testimony of other employees. For example, McNabb asked Lewis Puckett
"point blank" before the Fire, "What's going on?" Lewis Puckett

strongly indicates that the most likely scenario is that Puckett procured Williamson to burn the business. Puckett was personally facing hundreds of thousands of dollars in liability as a result of Williams Trull's failing circumstances and stood to lose his family farm and more. Saferight, on the other hand, was not shown to have any significant liabilities, likely would have forfeited to Williamson a disproportionately large percentage of his own insurance claim (for his tools) in the form of a procurement fee, and, if successful, would have destroyed the tools of his trade in the process. In fact, Saferight did not even own all his tools outright but had purchased them from Snap-On tool company, with financing to be paid over time (at a nominal rate of approximately $10 a week). (Saferight Dep. at 72.) Thus, any recovery on an insurance claim would be further reduced by the seller's claim for the unpaid balance. In the end, Saferight's recovery under such a scenario would likely have been relatively modest.

26. It is also unlikely that Saferight would have pinned his hopes of a fraud recovery on *someone else's* insurance contract (as opposed to an owner seeking to defraud his own insurance company). Apart from his tool claim, Saferight had no

---

responded, "we're going to redo the floor plan" and explained "we just need to lower the inventory and get some fresh stuff in." (McNabb Dep. at 17.) Similarly, Hinshaw testified that Lewis Puckett had told him "they were restructuring the floor plan." (Hinshaw Dep. at 31.)

demonstrated motivation. Other than the one time Puckett reprimanded him for failing to report his time, there is no evidence that Saferight had reason to harbor any ill will toward Puckett, and Puckett gave no indication that Saferight would consider himself a disgruntled employee as a result of his relatives' dismissals. Indeed, Puckett trusted Saferight to the point of allowing him to drive Puckett's BMW to Ohio to attend a repair training class because Saferight did not like to fly. (Saferight Dep. at 45.)

27. When Saferight was pressed on whether he played any role with Puckett in the setting of the Fire, he was evasive:

> Q. Did he [Williamson] ever call you to ask Billy Puckett to pay him the money that he was owed for burning the property?
>
> A. Not *calling* me.
>
> Q. Did he ever raise that question one time in a conversation with you?
>
> A. *If he has, I do not recall it.*
>
> Q. Did he ever talk with you before the fire about any proposition that Williams Trull had made to him – when I say "Williams Trull," that would be Mr. Puckett or anyone else on Mr. Puckett's behalf – to burn that business in order to recover insurance proceeds or for any other reason?
>
> A. *Not that I know of.* That's a no to me.

(Saferight Dep. at 66-67 (emphases added).) Saferight's answers demonstrate a deliberate attempt not to answer the question truthfully.

28. Williams Trull suggests finally that Saferight may have contracted to burn the Premises in retaliation for Puckett's termination of his grandfather and aunt one month earlier as the business continued its downward spiral. This is highly doubtful on this record. According to Saferight, Puckett seemed to care for his employees and wept when he had to let them go. (Saferight Dep. at 35.)[27]

29. By the nature of the act, arson for hire frequently can only be proved by circumstantial evidence. Considering the totality of the evidence, which includes an assessment of the credibility of the witnesses whom this court has had the opportunity to observe, the court finds that Federated has demonstrated by a preponderance of the evidence that Williams Trull, through Puckett, procured the Fire. Therefore, Federated has carried its burden with respect to Count I of the Complaint.

**B.    Complaint Count II: Material Misrepresentation**

30. North Carolina law governs this claim as well. To establish that Williams Trull, through Puckett, made a material misrepresentation or omission during Federated's investigation of the Claim, Federated must establish by a preponderance of the evidence that a statement was (1) false, (2) material, and (3) knowingly and willfully made. <u>Bryant v. Nationwide Mut. Fire</u>

---

[27]    The court addresses this and all issues as to Count I of the Complaint recognizing that the burden of proof rests at all times on Federated.

<u>Ins. Co.</u>, 313 N.C. 362, 370, 329 S.E.2d 333, 338 (1985).  The burden is on Federated because "[t]he insurance company has the burden of proving misrepresentation which is an affirmative defense to the enforcement of an insurance contract."  <u>Metro. Prop. & Cas. Ins. Co. v. Dillard</u>, 126 N.C. App. 795, 799, 487 S.E.2d 157, 160 (1997) (citing <u>Bryant</u>, 313 N.C. at 369, 329 S.E.2d at 338).

31.  North Carolina law at the relevant time required that language conforming in substance to the following be included in fire insurance policies: "This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning the insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto."  N.C. Gen. Stat. § 58-44-15(c) (2007).[28]  The Defendant does not argue that the Insurance Contract failed to conform in substance with this language and the court finds that it does.  (<u>See, e.g.</u>, Ex. 1, Doc. 109-4, Form No. CP 00 90 07 88, § A.[29])  By its plain

---

[28]  Although section 58-44-15 was repealed by N.C. Sess. Laws 2009-171, the repeal applied only to insurance contracts entered into or renewed on or after January 1, 2010.  N.C. Sess. Laws 2009-171, §§ 6, 7.

[29]  Section 58-44-15 did not apply to "contracts for automobile fire, theft, comprehensive and collision, marine and inland marine insurance."  N.C. Gen. Stat. § 58-44-15(a).  The part of the insurance policy designated "Commercial Inland Marine Coverage Part," however, contains language similar to that in section 55-44-15(c).  (<u>See</u> Ex. 1,

meaning, the language requires voiding of the insurance policy for willful concealment or misrepresentation of "any" material fact or circumstance as well as in the case of "false swearing" by the insured.[30]

32. A representation is not necessarily false under the first element of a material misrepresentation merely because it is not literally true and accurate in every respect. With respect to a claim, "[m]ere overstatement of value of the goods or premises lost in a fire, or an error in judgment with respect to their value, is not sufficient to prove an intentional misrepresentation." Bryant, 313 N.C. at 370, 329 S.E.2d at 338 (quoting jury instruction which neither party contended to be erroneous and finding jury instructions accurately explained the applicable law).

33. Whether a representation is false may turn on the nature and wording of the question asked. When a question can reasonably be interpreted as calling for an opinion or belief of the insured, the falsity of any representation turns on whether

---

Doc. 109-5, Commercial Inland Marine Conditions, Form No. CM 00 01 09 04, General Conditions, § A.)

[30]   The Insurance Policy uses the phrase "conceal or misrepresent a material fact." A material fact may be concealed by an omission in an answer to a question. See, e.g., Black's Law Dictionary 327 (9th ed. 2009) (defining "concealment," in part, as "[t]he act of refraining from disclosure, esp., an act by which one prevents or hinders the discovery of something," and, in the context of procuring insurance, "[t]he insured's intentional withholding from the insurer material facts that increase the insurer's risk and that in good faith ought to be disclosed").

the insured did in fact hold that opinion or belief at the time it is uttered. Thus, a mistaken opinion or belief does not satisfy the falseness requirement. Rather, the opinion or belief is false if the insured does not honestly believe the expressed opinion or belief and did not act in good faith. See Jeffress v. N.Y. Life Ins. Co., 74 F.2d 874, 876 (4th Cir. 1935) (applying North Carolina law to statements in insurance application).

34. A misrepresentation is "material," the second element, if knowledge or ignorance of the true fact would naturally and reasonably influence the judgment of Federated in accepting the proof of loss as presented by Williams Trull. In other words, the focus is on whether the misrepresented facts would "reasonably be expected to influence the decision [of the insurer] in investigating, adjusting or paying the claim." Bryant, 313 N.C. at 383, 329 S.E.2d at 345. Reliance on a misrepresentation by Federated, however, is not necessary. Id. at 371, 329 S.E.2d at 339 (noting approval of instruction to that effect).

35. A "willful misrepresentation," the third element, is a statement made "deliberately and intentionally knowing it to be false." Id. at 374, 329 S.E.2d at 340 (jury allowed to consider role, if any, insured's limited education might have played in his understanding of insurer's question).

36. As noted, Williams Trull, a corporation, acted primarily through Puckett, its sole owner and chief officer. The statements or omissions, or alleged false swearing, of Puckett relating to Williams Trull, therefore, are the statements or omissions of the insured, Williams Trull.

37. The court concludes, based on its Findings of Fact, that on several occasions Puckett's statements (and alleged omissions) about Williams Trull's financial condition resulted largely from ambiguous questions or questions that called for an opinion (e.g., use of the word "huge" in various contexts), were qualified by Puckett either as to the initial answer or with respect to Puckett's stated uncertainty or lack of knowledge about specific topics (e.g., specific amount owed Taylor Pittsburgh), or were literally true (e.g., GE Commercial had obtained no judgment against Williams Trull) or substantially true (e.g., ability to obtain equipment from another dealer and order parts from Cub Cadet). To the extent Federated complains of vague answers, it frequently asked vague questions. As to the Eddie interview, Federated overlooks the fact that Puckett lacked any records from which to give more detailed or accurate responses, and Puckett made this fact known as he attempted to respond to the insurer's inquiries.

38. Puckett had limited experience in operating a business and, despite having retained a consultant and certified public

accountants for Williams Trull, may not have known all the details of Williams Trull's overall financial position. This is reflected by testimony of Williams Trull employees and by Puckett's numerous statements at his EUO that he did not know the answer but that his accountants might. Indeed, Puckett opened his companies' books and records (including through his accountants) to Federated and candidly admitted in his EUO that he was concerned about the financial condition of Williams Trull in September 2007, noting that "anyone would be." (Puckett EUO at 91.) The old computer system used by Williams Trull, and the failure of an employee to make entries over a period of time, combined with Puckett's lack of access to year-end accounting information at the time of his interview with Eddie or the January 2008 EUO, also hampered his ability to answer questions with specificity and accuracy.

39. An insured cannot be allowed to play fast and loose with the truth or its responsibilities under an insurance contract, however. On three occasions, Puckett's responses were misleading: as to Federated's questions about whether Williams Trull's suppliers had discussed termination of their sales relationships; the company's financial situation as it related to the bounced checks; and importantly, Puckett's involvement in the Fire. The court finds that Puckett's answers were false, material, and made knowingly and willfully under the standards

set forth above. Specifically, Puckett's denials of any involvement in the Fire as well as knowledge of Williamson were false and misleading. The court concludes, therefore, that these misrepresentations and omissions satisfy all the elements of material misrepresentation or omission, and Federated has therefore carried its burden with respect to Count II of the Complaint.

### C. First Counterclaim: Breach of Insurance Contract

40. Williams Trull's First Counterclaim alleges breach of contract. North Carolina law governs this Counterclaim. The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract. Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citations omitted). To the extent the court does not conclude the Insurance Contract is void, the court's focus with respect to the First Counterclaim is whether Williams Trull has proved a breach of the Insurance Contract by a preponderance of the evidence. See Queen v. DeHart, 209 N.C. 414, 423, 184 S.E. 7, 12 (1936) (greater weight of the evidence); Lincoln Cnty. v. Skinner, 19 N.C. App. 127, 130, 198 S.E.2d 40, 42 (1973) (same).

41. Williams Trull alleges a failure by Federated to provide a blank proof of loss form within fifteen days of receiving notice of the Fire. The proof of claim was provided by Federated on October 19, 2007, by hand delivery and therefore

within fifteen days of receiving notice of the Fire on October 4, 2007. This action complied with statutory requirements. <u>See</u> N.C. Gen. Stat. § 58-3-40.

42. Williams Trull also alleges breach of contract due to Federated's failure to state its intentions within thirty days of Williams Trull's proofs of loss, as required by the Insurance Contract. This court found that Federated responded to the first and second proofs of loss within thirty days, rejecting the claim because Williams Trull did not submit a claim amount. Federated's responses also informed Williams Trull that the investigation was continuing under a complete reservation of rights. These responses clearly stated Federated's intent with respect to the proofs of loss. In light of the incompleteness of the first and second proofs of loss, rejection was appropriate.

43. Federated, through counsel, responded to the January 4, 2008, claim, the third proof of loss submitted, informing Williams Trull that the claim was neither accepted nor rejected pending completion of the investigation and evaluation of the claim. At that time there were outstanding requests for documents necessary to evaluate the claim. The nature of the third proof of loss and the need for further investigation is reflected in Williams Trull's supplement to the third proof of

loss nearly two weeks later which dramatically reduced the claimed amount for business loss of income.

44. Williams Trull asserts that Federated's hiring of outside counsel in October 2007 with a corresponding assertion of work product protection demonstrates a decision to deny coverage which was not timely communicated. Support for this assertion is found in opinions which hold that work product protection arises only in the presence of a reasonable possibility of litigation, which as a general rule only occurs after the insurer has made a decision with respect to the claim. E.g., Ring v. Commercial Union Ins. Co., 159 F.R.D. 653, 656 (M.D.N.C. 1995). "This general rule is not absolute, of course, and an insurer may produce evidence of circumstances that support the conclusion that it reasonably anticipated litigation prior to denial of the claim." Evans v. United Serv. Auto. Ass'n, 142 N.C. App. 18, 31, 541 S.E.2d 782, 790 (2001).

45. Federated has asserted that it anticipated litigation on October 17, 2007. (Tr. 4/16/10 at 24-27.) That does not mean, however, that Federated had made a decision to deny the claim. Indeed, in the months following retention of outside counsel, Federated advanced more than $150,000 to or on behalf of Williams Trull, which is entirely inconsistent with having made a decision to deny a claim. Nor was there a valid claim to deny until after the January 2008 submission of the third proof

of claim. Eddie's testimony that Federated had not made a decision regarding the claim when it retained outside counsel and that the large majority of fire cases in which counsel is retained are not litigated supports a conclusion that retention of outside counsel did not indicate a decision by Federated at that time to deny any claim which might be, or was, submitted by Williams Trull.[31]

46. The court concludes that Federated retained outside counsel not because it had decided to deny any claim that might be submitted by Williams Trull, but because it was becoming concerned about the possibility of litigation by Williams Trull, which was communicated through counsel, particularly given the ongoing investigation by law enforcement.

47. In light of the foregoing Findings of Fact and Conclusions of Law, the court concludes that Williams Trull has failed to carry its burden with respect to its First Counterclaim.[32]

---

[31] Williams Trull's arguments in this regard may also be considered as part of its Second Counterclaim with respect to an alleged failure to accept or deny the claim in a timely manner. To that extent, the court concludes that retention of counsel does not support the Second Counterclaim for the same reasons it does not support the First Counterclaim.

[32] Because of the court's conclusions, it need not reach Williams Trull's argument that Federated somehow enhanced Williams Trull's damages because it fostered a delay in a hypothetical re-opening of the business. See, e.g., Hampton Foods, Inc. v. Aetna Cas. & Sur. Co., 843 F.2d 1140, 1143 (8th Cir. 1988); Vt. Mut. Ins. Co. v. Petit, 613 F. Supp. 2d 154, 161 (D. Mass. 2009) (citing Hampton Foods and

**D. Second Counterclaim: UDTPA and N.C. Gen. Stat. § 58-63-15(11)**

48. Williams Trull's Second Counterclaim alleges that Federated unlawfully engaged in unfair or deceptive acts or practices in or affecting commerce under N.C. Gen. Stat. § 75-1.1 ("UDTPA") and/or N.C. Gen. Stat. § 58-63-15(11) ("Claims Act") by: (1) failing to affirm or deny coverage of claims within a reasonable time after Williams Trull submitted its proof of loss statements (N.C. Gen. Stat. § 58-63-15(11)(e)); (2) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear (N.C. Gen. Stat. § 58-63-15(11)(f)); and/or (3) failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under the Insurance Contract (N.C. Gen. Stat. § 58-63-15(11)(b)). (Doc. 8 at 16-17 (Counterclaims ¶ 37).)

49. North Carolina law governs this Counterclaim. Section 58-63-15(11) by its own language requires, however, that the practices enumerated in that subsection must be committed or

---

Bard's Apparel Mfg., Inc. v. Bituminous Fire & Marine Ins. Co., 849 F.2d 245, 251-52 (6th Cir. 1988)). Even if such a claim were viable, it is apparent that Williams Trull was in financial distress, without effective suppliers or prospect of obtaining them. The significant long-term debt and absence of evidence of any source of financing that could keep the company open as an ongoing operation, even with insurance proceeds (including those already advanced), leads the court to conclude that nothing Federated did or did not do would have prevented Williams Trull from re-opening its business beyond the extent it did so.

performed with such frequency as to indicate a general business practice before it can be actionable under the Claims Act.

50. Although violation of the Claims Act is actionable only by the Commissioner of Insurance, the types of conduct listed in the Claims Act can be used to support a private cause of action pursuant to the UDTPA. Westchester Fire Ins. Co. v. Johnson, 221 F. Supp. 2d 637, 642-45 (M.D.N.C. 2002). Conduct that violates section 58-63-15(11), even in the absence of a separate claim under that statute, constitutes a Chapter 75 violation as a matter of law. Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 71, 73, 529 S.E.2d 676, 683-84 (2000) (insurer's act of failing to attempt in good faith to effectuate prompt and fair claims settlements is a violation of N.C. Gen. Stat. § 75-1.1 "separate and apart from any violation of N.C.G.S. § 58-63-15(11)[f]");[33] Country Club of Johnston Cnty., Inc. v. U.S. Fid. & Guar. Co., 150 N.C. App. 231, 245-46, 563 S.E.2d 269, 279 (2002) (applying rule to all prohibited acts

_____

[33] As noted by the Fourth Circuit, "[w]hile proof of unfair claims practices does constitute per se proof of an unfair or deceptive trade practice under N.C. Gen. Stat. § 75-1.1, failure to prove unfair claims practices does not independently necessitate judgment as a matter of law against a related claim for unfair trade practices." High Country Arts & Craft Guild v. Hartford Fire Ins., 126 F.3d 629, 635 (4th Cir. 1997) (citation omitted). The Fourth Circuit found Gray inapplicable in a case in which the insurer reasonably questioned the validity of an insured's estimates that were not substantially corroborated and did not accurately represent actual damage, and in which initial and interim payments were made by the insurer even though liability was not clear. See Topsail Reef Homeowners Ass'n v. Zurich Specialties London, Ltd., 11 F. App'x 225, 234 & n.7 (4th Cir. 2001) (per curiam) (unpublished opinion).

under section 58-63-15(11)); see also Page v. Lexington Ins. Co., 177 N.C. App. 246, 249-50, 628 S.E.2d 427, 429 (2006).

51. An insurance company's conduct may be actionable under the UDTPA even if not a violation of the Claims Act. Significantly, under Gray the insured is not required to show that the insurer engaged in complained-of section 58-63-15 conduct with any frequency. Johnson, 221 F. Supp. 2d at 644-45 (citing Gray, which addresses section 58-63-15(11)(f)). A party asserting an unfair or deceptive trade practice must show the following:

> (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs. The determination of whether an act or practice is an unfair or deceptive practice that violates N.C.G.S. § 75-1.1 is a question of law for the court.

Gray, 352 N.C. at 68, 529 S.E.2d at 681 (citations omitted). Once the fact-finder has determined the facts of a case, i.e., that the party did what it is alleged to have done, the court then determines, as a matter of law, whether the facts establish an unfair or deceptive practice. Id.

52. More specifically, when an insurance company "engages in conduct manifesting an inequitable assertion of power or position, including conduct which can be characterized as unethical, that conduct constitutes an unfair trade practice." Country Club of Johnston Cnty., Inc., 150 N.C. App. at 245-46,

563 S.E.2d at 279 (quoting <u>Johnson v. First Union Corp.</u>, 128 N.C. App. 450, 458, 496 S.E.2d 1, 6 (1998)) (internal quotation marks omitted).

53. A mere breach of a contract generally is not sufficiently unfair or deceptive to sustain an action. "Substantial aggravating circumstances must attend a breach of contract to permit recovery as an unfair or deceptive trade practice." <u>Burrell v. Sparkkles Reconstruction Co.</u>, 189 N.C. App. 104, 111, 657 S.E.2d 712, 717 (2008).

54. For the reasons noted below, the court concludes that Federated did not engage in activity that provides Williams Trull a basis for a cause of action under the UDTPA or N.C. Gen. Stat. § 58-63-15(11).

## 1. Alleged Failure to Affirm or Deny Coverage in a Reasonable Time

55. Williams Trull asserts that Federated failed to affirm or deny coverage within a reasonable time after submission of the proofs of claim, as required by the Claims Act generally. Specifically, Williams Trull asserts that by the end of 2007 Federated had determined that it would deny the claim and that the investigation from that point forward was not in good faith but rather an effort to obtain information to bolster a predetermined belief that someone at Williams Trull was involved in the Fire and to "bombard Mr. Puckett with so many questions

about Williams Trull's financial condition that, eventually, some minor discrepancy would appear which Federated could contend was a 'misrepresentation' and thus assert as an alternative basis upon which to deny the claim." (Doc. 8 at 15.)

56. The court has already addressed Federated's actions with respect to providing Williams Trull its intentions at various times in late 2007 and early 2008. In addition, the claim itself was not properly presented until 2008 and, in light of the numerous "red flags" raised before and after Puckett's interview and EUO, Federated properly proceeded to determine whether to pay the claim or to present the question before a court, rather than prematurely accepting or denying a claim.

57. The court concludes that Williams Trull has failed to carry its burden of showing that Federated failed to accept or deny the Claim within a reasonable time.

## 2. Alleged Failure to Act in Good Faith

58. Williams Trull asserts that Federated did not attempt in good faith to effectuate a prompt, fair and equitable settlement of claims for which liability had become reasonably clear.

59. Federated, although it was not obligated to do so, made advance payments (albeit under reservation of rights) of more than $150,000 to or on behalf of Williams Trull during the

months following the Fire. These payments were made at the request of Williams Trull during a period when Federated's investigation began to raise serious questions about the possible participation of Puckett, and thus Williams Trull, in the Fire. Throughout the claims process, Federated kept Williams Trull informed that its investigation was ongoing and that it was reserving its rights. Federated also encouraged Williams Trull to submit a completed proof of loss which then could be evaluated and accepted or denied.

60. In light of the Findings of Fact, including Williams Trull's financial distress at the time of the Fire and the discovery of arsonist Williamson's relationship to Williams Trull employee Saferight, the court concludes that liability for the Claim did not become "reasonably clear" at any time prior to the commencement of this action. As a result, Williams Trull has failed to carry its burden of showing that Federated failed to "effectuate prompt, fair and equitable settlement" of the Claim.

### 3. Alleged Failure of Federated to Respond with Reasonable Promptness to Williams Trull's Requests

61. Williams Trull alleged that Federated failed to respond with "reasonable promptness" with respect to its requests. To the contrary, the record provides substantial evidence, in the form of letters and telephone memoranda, that

Federated promptly responded to communications received from Williams Trull. The responses were reasonably prompt under the circumstances, taking into account both the investigation and nature of the requests made by Williams Trull.

62. The court concludes, therefore, that Williams Trull has not provided sufficient evidence to support its contention that Federated failed to respond "reasonably promptly" to communications with respect to matters arising under the Insurance Contract.

63. In conclusion, the court finds that the evidence is insufficient to show a breach of contract by Federated or a violation of the UDTPA. On this record, Federated permissibly handled the claim under a reservation of rights. Its investigation regarding the lost income claim was hampered in part by the records deficiencies (many of which were damaged in the Fire) and by Puckett's professed limited understanding of the financial condition of the business.

64. In light of the foregoing Findings of Fact and Conclusions of Law, the court concludes that Williams Trull has failed to carry its burden with respect to its Second Counterclaim.

## III. CONCLUSION

For the reasons set forth herein, the court concludes that Federated has demonstrated by a preponderance of the evidence

that Williams Trull, through Puckett, directly or indirectly, procured the Fire and that Puckett knowingly and willfully made false representations to Federated by denying his involvement in (and knowledge of who procured) the Fire, denying that his suppliers had discussed termination of their sales agreements with Williams Trull, and stating that only "a couple" company checks had bounced and downplaying the severity of the problem in light of the facts. Thus, Williams Trull breached the Insurance Contract. The court also concludes that Williams Trull has failed to carry its burden on its counterclaims.

The result of the court's Findings of Fact and Conclusions of Law is that the Claim is not covered by the Insurance Contract, Defendant Williams Trull is not entitled to recovery on its Counterclaims, and Federated is entitled to the return of all sums it has advanced to or on behalf of Williams Trull, which in this case amount to $151,748.11.

IT IS THEREFORE ORDERED that judgment be entered in favor of Plaintiff Federated Mutual Insurance Company and against Defendant Williams Trull Company, Inc., on Counts One and Two of the Complaint for Declaratory Judgment (Doc. 1).

IT IS FURTHER ORDERED that judgment be entered in favor of Plaintiff Federated Mutual Insurance Company and against Defendant Williams Trull Company, Inc., on Defendant's Counterclaims (Doc. 8).

IT IS FURTHER ORDERED that this Memorandum Opinion and Order will constitute Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52.

A separate Judgment will issue.

/s/ Thomas D. Schroeder
United States District Judge

August 1, 2011